State ex inf. Atty. Gen. v. Hedrick.

---

THE STATE ex inf. JESSE W. BARRETT, Attorney General, ex rel. JAMES T. BRADSHAW, v. THOMAS J. HEDRICK, Respondent.

In Banc, April 29, 1922.

1. **CONSTITUTIONAL LAW: Removal of State Warehouse Commissioner by Governor: Special Law.** Section 5995, Revised Statutes 1919, providing for the removal by the Governor or the Legislature of the State Warehouse Commissioner for inefficiency, neglect of duty or misconduct in office, is not a special law, in violation of paragraph 32 of Section 53 of Article IV of the Constitution, inasmuch as said section applies to every person who may hold the office of Warehouse Commissioner and embraces all persons who are in or who may come into like situations and circumstances, and is, therefore, a general law, within both the letter and spirit of said section of the Constitution. [Per HIGBEE, J.; DAVID E. BLAIR and ELDER, JJ., concurring.]

State ex inf. Atty. Gen. v. Hedrick.

2. ———: ———: **Title of Act.** The Act of 1913 (Laws 1913, p. 354) creating the office of Warehouse Commissioner and providing for his appointment and removal and defining his powers and duties, of which Section 5995, Revised Statutes 1919, providing the manner and grounds of his removal, is a part, does not violate Section 28 of Article IV of the Constitution, since said act contains only one subject, which is clearly expressed in its title, and the provisions of said section relating to the removal of the Commissioner by the Governor for inefficiency, neglect of duty or misconduct in office are germane to and have an obvious connection with the subject expressed in the title. Nor does the title to said act go into particulars by mentioning "powers and duties" of the Commissioner, so as to exclude thereby legislation for his removal. [Per HIG-BEE, J.; DAVID E. BLAIR and ELDER, JJ., concurring.]

3. ———: ———: **Executive Exercise of Judicial Power: Distribution of Powers of Government.** The provisions of Section 5995, Revised Statutes 1919, authorizing the Governor to remove the Warehouse Commissioner for inefficiency, neglect of duty or misconduct in office, are not in violation of Article III of the Constitution as an attempt to invest the executive department with judicial authority, inasmuch as the act of removal is of an executive and not of a judicial nature. [Per HIGBEE, J.; DAVID E. BLAIR and ELDER, JJ., concurring.]

4. ———: ———: **Denial of Due Process of Law: Hearing.** There was no denial of due process of law, in violation of Section 30, Article II, of the Constitution, where the Governor removed the Warehouse Commissioner for inefficiency, neglect of duty and misconduct in office, the stipulated facts showing that the Commissioner had been served with a copy of the charges against him and given ten days' notice before the hearing and had appeared in person and with counsel, at the place fixed for the hearing, on the day fixed, and that the Governor, after reading the charges, had stated that the proof thereof was in certain records and documents which he had examined; and thereupon the Commissioner and his witnesses testified and the hearing lasted for sixteen hours, from ten a. m. of one day until two a. m. of the next day, when the Governor refused to adjourn the hearing for the taking of depositions and the production of other witnesses, and announced that the charges were sustained, and thereafter prepared and filed his findings, whereby he removed the Commissioner from office; particularly in view of the fact that the evidence which was produced before the Governor was not presented by the Commissioner in this proceeding, and the court was not asked to review such evidence. [Per HIGBEE, J.; DAVID E. BLAIR and ELDER, JJ., concurring.]

State ex inf. Atty. Gen. v. Hedrick.

5. ————: ————: **Jurisdiction to Review Acts of Governor.** The act of the Governor in finding the Warehouse Commissioner guilty of inefficiency, neglect of duty and misconduct in office in proceedings conforming to the requirements of Section 5995, Revised Statutes 1919, was an administrative or executive act of the Governor in a matter in which he had exclusive jurisdiction under Article III of the Constitution, and was not subject to be reviewed or set aside by the courts, which are without jurisdiction so to do. [Per HIGBEE, J.; DAVID E. BLAIR and ELDER, JJ., concurring.]

6. ————: ————: **Title of Act.** The Act of 1913 (Laws 1913, p. 354) creating the office of Warehouse Commissioner, fixing his term of office, defining his powers and duties and providing for his appointment and removal, of which Section 5995, Revised Statutes 1919, providing the manner and grounds of his removal, is a part, contains only one subject, which is clearly expressed in its title, as required by Section 28 of Article IV of the Constitution. And inasmuch as the purpose to create the office is expressly stated in the title and the act provides for the appointment by the Governor, and the power of removal at the pleasure of the Governor, without notice, the preferment of charges or the assignment of reasons, would exist, were it not for the restraints upon such power by the provisions of the act requiring the consent of the Senate to the appointment and fixing the tenure and requiring removal for cause, after charges, notice and a hearing, these provisions for removal are germane to the subject of the act, and are valid under the above section of the Constitution. [Per JAMES T. BLAIR, C. J.; HIGBEE, DAVID E. BLAIR and ELDER, JJ., concurring.]

7. ————: ————: **Special Law.** The contention of relator that said Act of 1913 (Laws 1913, p. 354) is a special law, in violation of Section 53 of Article IV of the Constitution, in so far as said Section 5995, Revised Statutes 1919, providing for the removal of the Warehouse Commissioner, is concerned, would be legally good against those parts of the act fixing the tenure of the office, and they would be equally invalid for the same reason; and, if so, inasmuch as the act provides for the appointment by the Governor, the power of removal at the pleasure of the Governor would exist and relator would have no standing to question his removal. [Per JAMES T. BLAIR, C. J.; HIGBEE, DAVID E. BLAIR, ELDER, JJ., concurring.]

8. ————: ————: ————: **Removal An Incidental Provision.** Since relator's position necessarily must be that the reason for legislation respecting the creation of the office of Warehouse Commissioner, the appointment thereto and the tenure of the office, is sufficient to justify the enactment of those provisions though they

are applicable to that office alone and hence that those provisions do not make the act a special one in violation of Section 53 of Article IV of the Constitution, then it must follow that the provisions of Section 5995 in regard to his removal, are valid, as they are merely incidental to the former, the rule being that when the principal provisions of an enactment are based upon sound classification, incidental provisions are justified by that fact and are not to be held void because they, incidents only, cannot be shown to rest upon distinctions adequate to sustain them if they stood alone and independent of the rest of the act of which they form a part. [Per JAMES T. BLAIR, C. J.; HIGBEE, DAVID E. BLAIR and ELDER, JJ., concurring.]

9. ———: ———: ———: **Tenure Subject to Limitations.** Inasmuch as the Legislature had the power to create the office of Warehouse Commissioner, it had also the power to impose such limitations and conditions with respect to its duration and termination as it deemed best, and also the power to provide for removal from such office as it willed, and the incumbent in such cases took the office subject to the conditions which accompanied it. [Per JAMES T. BLAIR, C. J.; HIGBEE, DAVID E. BLAIR, and ELDER, JJ., concurring.]

10. ———: ———: ———: **Presumption in Favor of Constitutionality: Reasonable Classification.** Before an act of the Legislature can be held invalid as special legislation in conflict with Section 53 of Article IV of the Constitution such invalidity must appear beyond a reasonable doubt. And in determining whether an act is special, the question is not whether, considering all the circumstances which exist, the Legislature might not constitutionally make a law which would include a larger class; but, on the contrary, it is whether it appears beyond a reasonable doubt that there are no distinctive circumstances appertaining to the class with respect to which it has legislated which reasonably justify its action in restricting the operation of the law to the persons, objects or places to which the law is made applicable. In view of these rules, said Act of 1913 (Laws 1913, p. 354), including the provisions for the removal of the Commissioner contained in said Section 5995, must be held not to be in conflict with said section of the Constitution, inasmuch as the inspection of grain, and the regulation of public warehouses, and their charges, the grading of grains, the formulation of rules for inspection and fixing fees therefor, the close personal supervision of the business and management of the warehouses required of the Commissioner, the large interests involved, the disastrous consequences of inefficiency, neglect of duty or misconduct in office on the part of the Commissioner, and other differences existing between the inspection of grain and that of other things, such as beverages, oils, etc., all serve to place the

former in a class by itself and authorize and require a separate law covering the same. [Per JAMES T. BLAIR, C. J.; HUGBEE, DAVID E. BLAIR and ELDER, JJ., concurring.]

11. ———: ———: **Exercise of Judicial Power: Distribution of Powers of Government.** Said Act of 1913 is not in conflict with Article III of the Constitution, since it does not attempt to vest the Governor with any judicial authority to remove the Warehouse Commissioner. Even though it provides for the making of charges, the giving of notice thereof and a hearing thereon in person or by counsel, such provisions are merely conditions imposed upon the exercise of an executive or administrative power. [Per JAMES T. BLAIR, C. J.; HIGBEE, DAVID E. BLAIR, and ELDER, JJ., concurring.]

12. ———: ———: **Due Process of Law: Hearing.** The record in this case showing that the Governor filed formal charges of inefficiency, neglect of duty and misconduct in office against relator as Warehouse Commissioner, as required by Section 5995, Revised Statutes 1919, the legal sufficiency of which is not questioned, and gave him notice thereof and of the time and place when and where they would be heard, as required by said section, and that relator appeared in person and by counsel, and testified orally, and other witnesses were examined and public books and records bearing on such charges were present at the hearing, which lasted for sixteen hours, when the Governor declared the hearing closed and that the charges were sustained and relator removed, and thereafter filed in the office of the Secretary of State his formal findings and removal, it cannot be held that relator was removed without due process of law, in violation of Section 30 of Article II of the Constitution, on the grounds (1) that the Governor offered no evidence; (2) that he had prejudged the matter; (3) that he refused to grant relator a continuance to procure other witnesses; and (4) that relator was kept in ignorance of the evidence against him. [Per JAMES T. BLAIR, C. J.; HIGBEE, DAVID E. BLAIR and ELDER, JJ., concurring.]

13. ———: ———: **Special Law.** Section 5995, Revised Statutes 1919, providing for the removal of the Warehouse Commissioner, is a special law in conflict with paragraph 32 of Section 53 of Article IV of the Constitution, inasmuch as he is an executive officer and appointed to perform executive and not judicial or legislative duties, and belongs to the same general class of executive officers as the Tax Commissioners, Game and Fish Commissioner, Drug and Pure Food Commissioner, Commissioner of Agriculture, Public Service Commissioners and others, and there is nothing in the Constitution to prevent the Legislature from enacting a general law, providing for the removal of all such officers for violating both civil and criminal law, of a character similar to Section

State ex inf. Atty. Gen. v. Hedrick.

9175, Revised Statutes 1919, applicable to certain county, city, town and township officers. [Per WOODSON, J.; WALKER, J., concurring.]

14. ———: ———: **Title of Act.** Said Section 5995, which was Section 4 of the Act of 1913 (Laws 1913, p. 354), is invalid because there was nothing in the title of said act regarding the grant of power to the Governor to prefer charges against the Commissioner, nor to hold a hearing or try him for any misconduct in office, nor to make a finding of facts against him, or to remove him from office for misconduct, as required by Section 28 of Article IV of the Constitution. [Per WOODSON, J.; WALKER, J., concurring.]

15. ———: ———: **Special Law.** To determine whether a given law is a special law, the subject of the law must be considered in the connection as used. And said Section 5995, Revised Statutes 1919, is in conflict with paragraph 32 of Section 53 of Article IV of the Constitution, inasmuch as the subject of such section is removal from office and the law only applies to a single officer appointed by the Governor with the consent of the Senate, namely the Warehouse Commissioner, and provides for his removal either by the Governor or by the Legislature, and there is nothing in such office to distinguish it from numerous other offices similarly situated, and a general law could have been passed making these methods of removal applicable to all such offices, and hence there was no reason for singling out this one office for special treatment. [Per GRAVES, J.; WALKER, J., concurring.]

16. ———: ———: **Title of Act.** The purpose of the title to an act is not only to inform the legislators, but the people and all who may be interested, as to what might be expected in the body of the bill. Like a sign board, it must indicate the general contents of the bill. It must not mislead either by false words or cunning omissions. It must not hide things, which, if known, would incur the wrath of either the legislators or the interested public. Deception, in any form, vitiates those things in the bill which have been hidden from view by the title. Tested by these rules, Section 5995, Revised Statutes 1919, is void because the provision contained in it for the removal of the Warehouse Commissioner by a statutory impeachment trial before the Legislature is not expressed in the title of the Act of 1913 (Laws 1913, p. 354), of which said section is Section 4, as required by Section 28 of Article IV of the Constitution. [Per GRAVES, J.; WALKER, J., concurring.]

*Quo Warranto.*

WRIT DENIED.

*Frank H. Farris* and *John I. Williamson* for relator.

(1) Sec. 5995, R. S. 1919, is unconstitutional and void for the reason that it is a special law, based upon an arbitrary classification, and is made applicable to a single individual only, whereas a general law could have been enacted, and said section is therefore in violation of Section 53 of Article IV of the Constitution. Par. 32, sec. 53, art. 4, Mo. Constitution; Secs, 3195, 3198, 5995, 9168, 9174, 9175, R. S. 1919; State v. Logan, 268 Mo. 169; State ex rel. v. Revelle, 257 Mo. 540; Moler v. Whisman, 243 Mo. 583; State ex inf. v. Southern, 265 Mo. 275; State ex rel. v. Perkins, 223 S. W. 406; State v. Seehold, 192 Mo. 734; State ex rel. v. Miller, 100 Mo. 440-451; Henderson v. Koenig, 168 Mo. 356; State v. Baskowitz, 250 Mo. 82; State v. Mikoicek, 225 Mo. 561; Budd v. Hancock, 66 N. J. L. 133; State v. Kelsey, 44 N. J. L. 31; State v. Loomis, 115 Mo. 314; Hubbell v. Higgins, 148 Iowa, 39; Johnson v. Gunn, 148 Cal. 749; State ex rel. v. Miller, 100 Mo. 448; State ex rel. v. Board of Curators, 268 Mo. 610; Black on Const. Law, p. 80; Cooley on Const. Limitations (7 Ed.) pp. 105, 106; 12 C. J. 716; State ex rel. v. Gordon, 245 Mo. 33; Consumer's League v. Ry. Co., 53 Colo. 54; Kane v. Ry. Co., 133 Fed. 681; Mo. Const., Art. 4, sec. 53, par. 32; R. S. 1919, sec. 9174. (2) Sec. 5995, R. S. 1919, is in conflict with Section 28 of Article IV of the Constitution, and is unconstitutional and void for the reason that the title to the act of which it is a part is fatally defective, in that it does not clearly express the subject of the act, nor does the title include within its scope and meaning any grant of power to the Governor to prefer charges, hold a hearing, make findings or remove the Warehouse Commissioner. State v. Sloan, 258 Mo. 313; State ex rel. v. Revelle, 257 Mo. 529; St. Louis v. Weitzel, 130 Mo. 616; City of Kansas v. Payne, 71 Mo. 162; State v. Great Western T. & C. Co., 171 Mo. 643; State v. Burgdoerfer, 107 Mo. 30; 1 Story, Constitution, sec. 451; State ex rel. v. Gordon, 233 Mo. 387; State v. Crites, 209 S. W. 863; Woodward Hard-

ware Co. v. Fisher, 190 S. W. 576; Berry v. Majestic Mill. Co., 223 S. W. 738; State v. Rawlings, 232 Mo. 544; State ex rel. v. Wilder, 200 Mo. 97; Vice v. City of Kirksville, 217 S. W. 77; Bell v. First Judicial Dist. Ct., 28 Nev. 297; State v. Rawlings, 232 Mo. 558; Brooks v. Hydorn, 76 Mich. 278.   (3)   Sec. 5995 is void because in violation of Article III of the Constitution, in that it attempts to invest the executive department with judicial authority.   Rhodes v. Bell, 230 Mo. 149; Laws 1921, p. 129, sec. 16; State v. Fry, 4 Mo. 192; Mechem on Public Officers, sec. 455, p. 289; State ex rel. v. Wells, 210 Mo. 610; State v. Frazier, 39 N. D. 444; State v. Eberhart, 116 Minn. 313; Atty.-General v. Jochin, 99 Mich. 358; Bailey on Hab. Corpus, sec. 173; 11 C. J. 108, 120; State v. Brunquist, 141 Minn. 308; State v. Common Council, 53 Minn. 238; In re Nash, 181 N. W. 570; Ekern v. McGovern, 154 Wis. 157; People v. Stuart, 74 Mich. 411; Dullam v. Willson, 53 Mich. 400; State ex rel. v. Pritchard, 53 N. J. L. 113; Page v. Hardin, B. Mon. (Ky.) 672; Commonwealth v. Slifer, 25 Pa. St. 28.   (4)   The so-called hearing before the Governor was so conducted by him as to constitute a denial to relator of the rights secured to him by Sec. 30 of Article II of the Constitution, and the attempted removal of relator from the office of Warehouse Commissioner was void for that reason.   Wilcox v. Phillips, 260 Mo. 679; Farmers' Elev. Co. v. Ry. Co., 266 Ill. 572; State ex rel. v. Maroney, 191 Mo. 554; State ex rel. v. Denison, 90 Mo. 24; State ex rel. v. Work. Comp. Bureau, 180 N. W. 50; Mechem, Pub. Officers, sec. 454; Ekern v. McGovern, 154 Wis. 157; Hagerty v. Shedd, 75 N. H. 393.

*John H. Lucas* and *Beardsley & Beardsley* for respondent.

(1)   Sec. 5995, R. S. 1919, is not enacted in violation of Section 53, Article IV, of the Constitution.   Humes v. Railroad, 82 Mo. 221; State ex rel. Martin v. Wofford, 121 Mo. 69; Elting v. Hickman, 172 Mo. 257; State

ex rel. Budd v. Hancock, 66 N. J. L. 133; R. S. 1909, secs. 11674, 5958, 5989, 5116, 5214, 6545, 5729, 5888, 6055, 12409, 12413, 12176, 12765; Secs. 9017, 715, 6707, 7976, par. 57, 12765; Miner's Bank v. Clark, 252 Mo. 29; State ex rel. v. Taylor, 224 Mo. 475; State ex rel. v. Fort, 210 Mo. 532; State ex rel. v. Yancy, 123 Mo. 401; State v. Whitaker, 160 Mo. 59; State v. Nelson, 52 Ohio St. 88; State ex rel. v. Gordon, 245 Mo. 31; Consumers' League v. Ry. Co., 53 Colo. 54; Kane v. Erie Railroad, 133 Fed. 685; State v. Tower, 185 Mo. 94; McEldowney v. Wyatt, 44 W. Va. 711; Carnegie Nat. Gas Co. v. Swiger, 72 W. Va. 557; Allen v. Smith, 84 Ohio St. 283; Pierce v. Van Dusen, 78 Fed. 703; McGuire v. Railroad, 131 Iowa, 340; State ex inf. v. Southern, 265 Mo. 284; Humbolt v. Avery, 195 U. S. 480, 49 L. Ed. 286; Los Angeles v. Los Angeles Co., 117 U. S. 558, 44 L. Ed. 886. (2) Sec. 5995, R. S. 1919, is not in conflict with the provisions of Sec. 28, Art. IV, of the Constitution. Laws 1913, p. 354; Art. 2, ch. 60, R. S. 1909; Sec. 6773, R. S. 1909; State ex rel. v. Slover, 134 Mo. 10; State ex rel. v. Mead, 71 Mo. 266; State ex rel. v. Ranson, 73 Mo. 78; Booth v. Scott, 276 Mo. 1; City of St. Louis v. Rys. Co., 263 Mo. 387; Coffey v. Carthage, 200 Mo. 616; State ex rel. v. Williams, 232 Mo. 56; In re Blodgett, 27 Hun, 12; McPherson v. Blocker, 92 Mich. 377; Hardy v. Kingman Co., 65 Kan. 111; Beason v. Christian, 129 Ind. 535; Clark v. Finley, 93 Tex. 171; Lowe v. Bourbon Co., 6 Kan. App. 603; Treky v. Marye, 100 Va. 40; Rogers v. Morrill, 55 Kan. 737; Rehfield's Estate, 198 Mich. 249; Little Co. v. Hazen Co., 185 Mich. 316. (3) Section 5995 is not void as being in violation of Article III of the Constitution. It is not an attempt to invest the executive department with judicial authority. State ex rel. v. Wells, 210 Mo. 601; State ex rel. v. Burney, 269 Mo. 602; State ex rel. v. Hawkins, 44 Ohio St. 113; State ex rel. v. Hay, 45 Neb. 329; Wilson v. North Carolina, 169 U. S. 593; State ex rel. v. Ansel, 76 S. C. 395; Keenan v. Ferry, 24 Tex. 253; Cameron v. Parker, 2 Okla. 277; State v. Burke, 8 Wash. 412; State ex rel. v. Grant, 14 Wyo. 41. (4) The pro-

ceedings before the Governor are under and in accordance with the provisions of the law; and it will not be permissible in this action of *quo warranto,* or any other action, to interfere with the result thereof.   State ex rel. v. Stone, 120 Mo. 428; Albright v. Fisher, 164 Mo. 56; State ex rel. v. Allen, 180 Mo. 31; State ex rel. v. Wells, 210 Mo. 601; Germaine v. Ferris, 176 Mich. 585; Shipman v. State Live Stock Comm., 115 Mich. 488; State ex rel. v. Townsend, 30 Del. 19; State ex rel. v. Huston, 27 Okla. 606; Rice v. Draper, 207 Mass. 577; Huidekoper v. Hadley, 177 Fed. 12; State ex rel. v. Meier, 143 Mo. 439; State v. Ansel, 76 S. C. 395; People v. Morton, 156 N. Y. 136; State ex rel. v. Shepherd, 179 Mo. 236; State ex rel. v. Crandall, 269 Mo. 57; State ex rel. v. Shields, 272 Mo. 342; 12 C. J. 894, 899; Louisiana v. McAdoo, 234 U. S. 633, 58-L. Ed. 1506.

HIGBEE, J.—This is an information in the nature of a *quo warranto* by the Attorney-General at the relation of James T. Bradshaw, charging that the respondent usurped, intruded into and unlawfully holds the office of warehouse commissioner, and praying judgment of ouster against the respondent.   Respondent waived the issue of the writ, entered his appearance in this action, and filed his return, in which he pleads the action of the Governor removing relator from office, and his appointment, confirmation and qualification,   Relator filed his reply, pleading that Section 5995, Revised Statutes 1919, under which he was removed by the Governor, is violative of the Constitution in several respects and that he was not afforded a hearing as required by that section, so that his removal amounted to a denial of due process of law.

The case was submitted upon the following stipulation:

"1.   It is admitted that the notice given by the Governor of Missouri to said Bradshaw, notifying him of the time and place when certain charges against him would be heard, was as follows:

" 'NOTICE.

" 'Honorable James T. Bradshaw,

" 'Warehouse Commissioner of Missouri,

" 'Jefferson City, Missouri.

" 'Dear Sir:

" 'Take notice that by virtue of authority conferred upon me by Section 5995, Revised Statutes of Missouri, 1919, and for the purpose of removing you from the office of Warehouse Commissioner, I, Arthur M. Hyde, Governor of Missouri, have made charges of inefficiency, neglect of duty, and misconduct in office against you as such Warehouse Commissioner, a copy of which charges are hereto attached and made a part of this notice.

" 'You are hereby given notice that on the 11th day of June, 1921, at the office of the Governor, in the City of Jefferson, at the hour of ten o'clock a. m. you may appear in person or by counsel to be publicly heard to make defense, if any defense you have, against the said charges of inefficiency, neglect of duty and misconduct in office. You will govern yourself accordingly.

" 'Given under my hand at the office of the Governor, in the City of Jefferson, this 28th day of May, 1921.

" 'ARTHUR M. HYDE, Governor.'

"2. It is admitted that the charges preferred by the Governor against said Bradshaw are as follows:

" 'CHARGES.

" 'To the Secretary of State,

" 'Jefferson City, Missouri.

" 'Sir:

" 'I, Arthur M. Hyde, Governor of Missouri, by virtue of authority vested in me by Section 5995, Revised Statutes of Missouri, 1919, and for the purpose of removing from the office of Warehouse Commissioner of Missouri, Honorable James T. Bradshaw, now incumbent thereof, do hereby charge that the said James T. Bradshaw, Warehouse Commissioner of Missouri, has been guilty of inefficiency, neglect of duty, and misconduct of office, in the following respects and particulars:

" '(1)    That, notwithstanding the said Bradshaw was, by the State Auditor and the Supreme Court, denied recovery out of the State Treasury of the sum of $157.40 for traveling expenses outside of the State of Missouri, he, nevertheless charged the same item and amount to the private inspection fund, the surplus of which was, and is, due the State of Missouri.    (Book I, page 43, Check 124, Record of Private Inspection Fund).

" '(2)    That, nothwithstanding the said Bradshaw was, by the State Auditor, refused recovery out of the State Treasury of the sum of $65.44 for a trip to Minnesota, he nevertheless charged said item to the private inspection fund above mentioned.    (Book 1, page 65, Check 330, Record of Private Inspection Fund).

" '(3)    That, notwithstanding the Supreme Court of Missouri held that the expense of trips outside the State were not proper charges against the State, nevertheless the said Bradshaw did on October 20, 1920, charge said Private Inspection Fund and receive therefrom the sum of $103.34 for a trip to Minneapolis.    (Book 1, page 173, Record of Private Inspection Fund).

" '(4)    That, notwithstanding the salary of the said Bradshaw for all his services is fixed by law at $4500 per annum, nevertheless the said Bradshaw did, on March 31, 1921, charge to the said Private Inspection Fund and collect therefrom in addition to said salary the sum of three hundred dollars (Book 2, page 13, Check 436, Record of Private Inspection Fund), and on April 30, 1921, the sum of one hundred dollars (Book 2, page 17, Check 466, Record of Private Inspection Fund).

" '(5)    That the said Bradshaw collected from the State of Missouri, the sum of $44.78 covering the expenses of an alleged trip to Jefferson City, St. Louis, and return, on January 11, 12, 13 and 14, 1921, which payment was included in State Treasurer's Draft No. 63141, and also collected from the Private Inspection Fund for "Exp. to Jeff. City, St. Louis and return, Jan. 10, 11, 12, 13, 1921, $44.78" (Book 2, p. 5) and also collected Jan.

10, 1921, "Exps. to Jeff. City and St. Louis on official business Jan. 1921, $43.78." (Book 1, page 173, Check 303, Record of Private Inspection Fund).

" '(6)    That the said Bradshaw collected from the State Treasury included in above mentioned State Treasurer's draft, the sum of $45.89 covering expenses of trip to Jefferson City, on Jany. 30, 31, Feb. 1, 2, 3, 4, 1921, and also collected from said Private Inspection Fund for "Exp. to Jeff. City, St. Louis, and return, Jan. 30, 31, Feb. 1, 2, 3, 1921, $45.89." (Book 2, page 5, Record of Private Inspection Fund).

" '(7)    That the said Bradshaw has paid and still is paying to certain employees of his department larger salaries than are allowed by law to be paid, charging the salaries allowed by law to be paid to such employees out of the State Revenue Fund, and the surplus out of the Private Inspection Fund.

" '(8)    That said Bradshaw has charged to the State expenses and costs of trips made for political and private purposes only.

" '(9)    Said James T. Bradshaw, Warehouse Commissioner, has and does now continue in the employ of his department persons who are notably inefficient and are so rated by the Warehouse Committee of the Board of Trade of Kansas City, and of the U. S. Department of Agriculture, Bureau of Markets, and whose inefficiency is well known to said Bradshaw, or could well and easily be determined by the said Bradshaw by the most casual investigation.

" '(10)    Said James T. Bradshaw, Warehouse Commissioner, permitted the serious waste to the State in that, through lax and wasteful administration, he permitted and allowed the accumulation of surplus grain samples within his office to be used for private purposes, continuing such practice until approximately the latter part of 1918, ceasing such practice only after the United States Food Administration had started an investigation and the case had been put in the hands of the United States Secret Service.    During that period said grain

294 Mo.—3

samples were allowed to be taken and carried away from the office by private parties.

" '(11)   Said James T. Bradshaw does not now exercise proper care in the collection and disposition of said surplus grain samples. The records of sales of said grain samples show that the private weighing and inspection fund, received, for the month of April, 1921, $24.60; for the month of March, 1921, $86.40; for the month of February, 1921, $75.04; for the month of January, 1921, $92.34.

" '(12)   Said James T. Bradshaw, by his inefficient administration permitted the expense of his department during the year ending December 31, 1920, to increase $10,202.75, over the expenses for the year ending December 31, 1919, although the business done was less and receipts of said department for the same period show a decrease of $3,336.82.

" 'I do hereby set down the 11th day of June, 1921, as a day upon which hearing of said charges shall be had at the office of the Governor at Jefferson City, State of Missouri, beginning at ten o'clock a. m.

" 'Given under my hand at the office of the Governor in the City of Jefferson, this 28th day of May, 1921.
" 'ARTHUR M. HYDE, Governor.'

"3.   It is admitted that at all times in the pleadings mentioned, both relator, Bradshaw, and respondent, Hedrick, possessed all of the qualifications required by law to render each of them eligible to appointment to the office of Warehouse Commissioner of the State of Missouri, and each of them is still so eligible; that said Bradshaw was on the — day of April, 1919, duly appointed to said office for a term of four years and was thereafter duly confirmed, and accepted said appointment and took possession of said office and so remained until said Hedrick took possession of said office on or about June 15th, 1921; that on or about June 15, 1921, the Governor of Missouri did appoint said Hedrick to said office and said Hedrick was thereafter confirmed by the Missouri Senate and took possession of said office and has

ever since remained in possession thereof; that since said Hedrick took possession of said office, said Bradshaw has demanded of him that he surrender the possession thereof to said Bradshaw, but that said Hedrick declined to do so.

"4. It is admitted that the hearing on said charges against said Bradshaw was had before the Governor of Missouri, beginning at ten o'clock in the forenoon of Saturday, the 11th day of June, 1921, and that the same was continued until about two o'clock on the morning of Sunday, June 12, 1921.

"That during the hearing (the witness Bradshaw being then upon the stand) the following occurred:

" 'Governor Hyde: Mr. Williamson, the date of this hearing is June 11th; every witness that you brought here has had an opportunity to testify; we can't afford to shut down this end of the government a bit more than Mr. Bradshaw can his end, and this hearing will terminate when these witnesses have been heard.

" 'Judge Williamson: We protest that we are denied the hearing guaranteed us by law, and now avow our desire, ability and intention, if permitted, to do so, to produce various witnesses from various parts of the State to testify to the effect that the charges here preferred against Mr. Bradshaw are not well founded in fact.

" 'Governor Hyde: Just take this for the purpose of this hearing; it will be admitted that witnesses could be produced who will testify as stated.

" 'Judge Williamson: Will Your Excellency permit me to make an offer of proof which shall be taken as the testimony?

" 'Governor Hyde: Oh, you can offer anything in the world.

" 'Judge Williamson: Well, we now avow that we can and will, if given the opportunity so to do, produce before the Governor the personal attendance and evidence of witnesses, or the depositions of witnesses at various and numerous parts throughout the State, which

witnesses know and will testify that the management of the department under Mr. Bradshaw's administration in the places where they are familiar with the conditions, has been honest, efficient, economical, and satisfactory to them; that these witnesses will be and are men of the highest character, of all political faiths and of none—no political faith—and that they will testify from their own knowledge, observation and experience covering the entire period covered by the charges.

" 'Governor Hyde: As heretofore stated, the hearing will terminate with the witnesses who appeared on the day of the hearing.'

"Further on during the examination of the witness Bradshaw, the following occurred:

" 'Judge Williamson: Do I understand the Governor to be serious in the statement that he intends to continue this hearing until six o'clock.

" 'Governor Hyde: We will continue it until we hear this witness through.

" 'Judge Williamson: I was going to say I would have to deprive myself of that opportunity until six o'clock, because I am not going to stay here until six o'clock.

" 'Senator Irwin: You have had this witness on the stand for two hours and a half.

" 'Judge Williamson: Yes, but we haven't had a chance to tell you half.'

"After which, witness Bradshaw further testified and at the conclusion thereof the following colloquy ensued:

" 'Governor Hyde: Are you through?

" 'Judge Williamson: No sir, we are not through. I would like to have an opportunity as soon as our books arrive, as soon as we can procure an audit of the books, to go into all these matters thoroughly and fully show Your Excellency—

" 'Governor Hyde: Have you any witnesses that you subpoenaed to be here to-day and are here to-day that have not been heard?

" 'Judge Williamson: We have no power to subpoena any witnesses.

" "Governor Hyde: Have you any witnesses that you want to be heard that are here now or have been here on the day of the hearing?

" 'Judge Williamson: Not at ten minutes to two o'clock on Sunday morning, Your Excellency.

" 'Governor Hyde: Have you anything further to say, Mr. Bradshaw?

" 'Mr. Bradshaw: I want the witnesses to be heard, Mr. Bingham is to be here Monday.

" 'Governor Hyde: Have you got the witnesses here?

" 'Mr. Bradshaw: We will be here Monday morning.

" 'Governor Hyde: You knew this hearing was set for June 11th, did you not?

" 'Mr. Bradshaw: Yes.

" 'Governor Hyde: Were they here on June 11th?

" 'Mr. Bradshaw: I had no idea you would get through in a day.

" 'Governor Hyde: Are they in attendance on this hearing?

" 'Mr. Bradshaw: They will be here.

" 'Governor Hyde: Did you have them here June 11th?

" 'Mr. Bradshaw: I couldn't.

" 'Governor Hyde: The hearing is adjourned.

" 'Judge Williamson: Will any further evidence be heard?

" 'Governor Hyde: Not in this case.'

"That thereupon the Governor adjourned said hearing and thereafter prepared and filed his findings whereby he removed said Bradshaw from his office of Warehouse Commissioner.

"5. It is admitted that no witnesses were introduced to testify in support of said charges (unless the testimony of witnesses introduced by said Bradshaw

supported said charges); that ten days' notice was given of the date and place of said hearing; that the said Bradshaw applied to the Governor to appoint a commissioner to take testimony of various witnesses in various parts of the State in his behalf, and said request was denied; that he asked further time in which to take depositions of witnesses and this request also was denied.

"6.    It is admitted that said Bradshaw claimed he had arranged for other witnesses to be present on Monday morning, June 13th, 1921, to testify in his favor concerning said charges, and that these witnesses were never heard.

"7.    It is further admitted that all of the evidence that was heard in this proceeding and all proceedings at said hearing were taken down in shorthand and afterwards transcribed and filed in the office of the Secretary of State, together with the Governor's findings thereon, and that the foregoing excerpts of testimony are taken from said transcript, and it is understood and agreed that either relator or respondent or both may present in an abstract of the evidence and proceedings, such additional portions of said transcript as he may desire, such abstract to be served on the other party in time to verify the same by comparing it with said transcript of the proceedings before the Governor and the same shall be considered with the same effect and as fully as the other facts stated in this stipulation, provided, however, that nothing herein contained shall be construed as an admission by relator that respondent was ever lawfully appointed to the office of Warehouse Commissioner by the Governor of Missouri, nor that said alleged appointment was ever lawfully confirmed by the Missouri Senate, nor shall anything herein contained be construed as a waiver by relator of his contention, as set forth in his pleadings herein, that said alleged appointment and confirmation and each of them were void; and conversely, nothing herein contained shall be construed as an admission by respondent that said alleged appointment and confirmation or either of them were not law-

fully made, nor as a waiver by respondent of his contention, as set forth in his pleadings herein, that said alleged appointment and confirmation were valid.

"8.   It is admitted that six witnesses were called in behalf of said Bradshaw and none were called against him.  It is further stipulated that respondent's motion to strike out certain parts of the reply may be withdrawn and the case submitted on the issues of law and facts made by the petition, the answer, the reply and this stipulation, including matter to be printed from the abstract of record filed in office of Secretary of State; by either party hereto."

The relator rests his contention on the following propositions:

I.   That Section 5995 is a special law, based upon an arbitrary classification, and is made applicable to a single individual, whereas a general law could have been enacted, and said section is therefore violative of Section 53 of Article IV of the Constitution.

**Power to Remove Officer: Special Law.**

The constitutional provision relating to special legislation is as follows:

"In all other cases where a general law can be made applicable, no local or special law shall be enacted; and whether a general law could have been made applicable in any case is hereby declared a judicial question, and as such shall be judicially determined, without regard to any legislative assertion on that subject."   [Par. 32, Sec. 53, Art. IV, Constitution.]

Section 5995, Revised Statutes 1919, is as follows:

"The Governor may remove the Commissioner for inefficiency, neglect of duty, or misconduct in office, giving him a copy of the charges against him and an opportunity of being publicly heard in person or by counsel, in his own defense, upon not less than ten days' notice.  If such Commissioner shall be removed, the Governor shall file in the office of the Secretary of State a complete statement of all charges made against such Commissioner, and his findings thereon, together with

a complete record of the proceedings. The Legislature also shall have the power, by a two-thirds vote of all members elected to each house, after ten days' notice in writing of the charges and a public hearing, to remove the Commissioner from office for dereliction of duty, or corruption, or incompetency.''

This is one of the sections of Article II, Chapter 49, Revised Statutes, and is entitled, ''Inspection of Grain.'' Section 5994 provides for the appointment of a Warehouse Commissioner by the Governor by and with the advice and consent of the Senate. Section 5995 provides for the removal of the Commissioner for inefficiency, neglect of duty or misconduct in office. The remaining sections of the article pertain to the duties of the office, salary of the Commissioner and the details of the conduct of the business of the office. It is the only statute relating to the office.

The provision of the Constitution referred to was contained in the Constitution of 1865. It has been before the court for consideration in many cases. ''An act which embraces all persons 'who are, or who may come into like situations and circumstances, is not a special act.' [Humes v. Railroad, 82 Mo. 221.]''—State ex rel. Martin v. Wofford, 121 Mo. 62, 69.

''It is well settled that a law which includes all persons who are in or who may come into like situations and circumstances, is not special legislation. [State ex rel. v. Wofford, 121 Mo. 61; State ex rel. v. Yancy, 123 Mo. 391; Spalding v. Brady, 128 Mo. 653; State ex rel. v. Higgins, 125 Mo. 364.]''—Elting v. Hickman, 172 Mo. 237, 257.

In Miners' Bank v. Clark, 252 Mo. 30, it is said: ''A statute is not special or class legislation if it apply to all alike of a given class, provided the classification thus made is not arbitrary or without a reasonable basis. [State v. Julow, 129 Mo. 163; White v. Railroad, 230 Mo. 287, l. c. 305-306.] 'The courts, before pronouncing a statute void, demand to be satisfied beyond a reason-

able doubt of its vice, so this court has announced,. "Both upon principle and authority the acts of the Legislature are to be presumed constitutional until the contrary is clearly shown; and it is only when they manifestly in- infringe on some provision of the Constitution that they can be declared void for that reason. In case of doubt, every possible presumption not directly and clearly in- consistent with the language and subject-matter,˙ is to be made in favor of the constitutionality of the act." ' " (Citing cases.) [State ex rel. v. Kimmel, 256 Mo. 611, 642; State ex rel. v. Wilson, 232 S. W. (Mo.) 140, 145.]

The distinction between a special and a general law was clearly expressed in State ex rel. Budd v. Hancock, 66 N. J. L. 133, 48 Atl. 1023, as follows:

"What constitutes a special law within the meaning of the Amended Constitution has been repeatedly ad- judicated.˙ A law is special in a constitutional sense . when, by force of an inherent limitation, it arbitrarily separates some persons, places or things from others upon which but for such limitation it would operate. The test of a special law is the appropriateness of its pro- visions to the objects that it excludes. It is not, there- fore, what a law includes that makes it special, but what it excludes. If nothing be excluded, that should be con- tained, the law is general. Within this distinction be- tween a special and a general law, the question in every case is whether any appropriate object is excluded to which the law, but for its limitations, would apply. If the only limitation contained in a law is a legitimate classification of its objects, it is a general law. Hence, if the object of a law have characteristics so distinct as reasonably to form, for the purpose legislated upon, a class by itself, the law is general, notwithstanding it operates upon a single object only; for a law is not gen- eral because it operates upon every person in the state, but because every person that can be brought within its predicament becomes subject to its operation. . . .

"In the present case, in view of the admitted fact that˙there is no other officer in the state of like character

to that upon which the law in question operates, it is obvious that the law excludes no object to which its provisions are appropriate, unless it be maintained that the salary of no state officer can be increased unless, by the same law, the salary of every other state officer is likewise increased. . . . If on the contrary, this act is special only in the sense that its object is single, the question of its special character in a legal sense does not arise.''

See also State ex rel. v. Gordon, 245 Mo. 12, 31, and State v. Whitaker, 160 Mo. 59.

Under the present Constitution, the General Assembly has passed laws relative to separate, distinct, special subjects and creating separate and distinct offices. It has created different and distinct departments and provided for the appointment and removal of officers, such as bank commissioner, insurance commissioner, inspector of oils, inspector of beverages, food and drug commissioner and numerous others. Some of these are removable for cause, some at discretion. In some instances the appointment and removal require the concurrence of the Senate. It is suggested in relator's brief that a general law applicable to all appointive state officers could easily have been passed. Such a bill would relate to more than one subject, and would be obnoxious to Section 28 of Article IV of our Constitution. But it is insisted that a general law applicable to the removal of all appointive state officers could have been passed. However, as the act is general and not special legislation, if the power of removal from office is incident or germane to the subject, it may be properly included therein, as we will endeavor to show in the next paragraph of this opinion. It has never been understood that there must be a general law relating to the appointment, conduct of office or removal from office of appointive officers, or reducing such offices to common periods of duration or salary, or to provide a uniform manner of removal and the filling of vacancies, or that every appointment by the Governor should be confirmed by the State Senate.

Section 5995 applies to every person who may hold the office of Warehouse Commissioner. No incumbent of this office is excluded from its operation. The act complies with the letter and spirit of the section of the Constitution invoked, and is no more a special act than that creating the office of inspector of oils, bank commissioner, or any of the other offices mentioned above. A simple reading of State v. Logan, 268 Mo. 169, will suffice to show that the act under consideration in that case was a special or local act. It could apply to Jasper County, and no other county in the State.

II.   That Section 5995 conflicts with Section 28 of Article IV of the Constitution in that the title does not clearly express the subject of the act, nor include within its meaning any grant of power to the Governor to prefer charges, hold a hearing, make findings or remove the Warehouse Commissioner. A minor contention is that in mentioning "powers and duties" the title goes into particulars, and that legislation not relating to powers and duties is thereby excluded.

Title of Act.

Section 5995 is part of an act passed in 1913. [Laws 1913, p. 354.] The title is as follows:

"An act to repeal Article 2 of Chapter 60 of the Revised Statutes of Missouri, 1909, relating to inspection of grain and hay, and to enact in lieu thereof a new article, to be known as Article 2, relating to inspection and weighing of grain, abolishing the office of Railroad and Warehouse Commissioners, creating the office of Warehouse Commissioner and fixing his powers and duties, with an emergency clause."

The general rule is that the title should express the subject, but need not mention the details or incidents, nor furnish an index to or bill of particulars of the act. If legislation fairly relates to the subject, it can read its "title" clear. In 36 Cyc. 1017, it is said:

"The provisions of the various constitutions relating to the subject-matter and titles of acts should be con-

strued liberally to uphold proper legislation, all parts of which are reasonably germane on the one hand, and to prevent trickery on the other hand. The restriction requiring the subject of an act to be expressed in its title should be reasonably construed, considering substance rather than form, to require the expression in the title of the general object but not the details or incidents, or means of effecting the object sought, and to include the subject and not the purpose of the act and the reasons which brought about the enactment of it by the legislature.''

At page 1028: ''The title may be comprehensive, and need not be a synopsis of the entire act, but may cover any matters having congruity and proper connection with it.''

This is clearly illustrated in the following cases.

In State ex rel. v. Slover, 134 Mo. 10, the question was as to the forum or court in which should be tried an election contest to determine which of two men had been elected County Marshal of Jackson County. No reference was made to election contests in the title of the act. The court said:

''Now the act of February 1, 1871, had the single comprehensive title of 'An Act establishing the office of Marshal of Jackson County, *and defining his powers* and duties.' At once the suggestion comes as to the method of electing or appointing the incumbent, the length of his term, the salary or perquisites, the filling of the vacancy in case of death or resignation, and nothing could be more natural than to look to the body of the act to ascertain what provision had been made to insure the orderly succession in the incumbency of the office, and to provide for settling the dispute of rival claimants thereto. Certainly such a provision as is found in section 16 would be germane to the subject and would have an obvious connection with it. Indeed, we may remark that in the then prevailing system of providing specially for contesting elections, had the Legislature not have provided the right of contest for this office, and designated

the tribunal, it might have been considered *casus omissus.*" [L. c. 17 and 18.]

The title to the act uses the words "and defining his powers and duties," being in that respect identical with the title to the act in question.

In State ex rel. v. Ranson, 73 Mo. 78, l. c. 86, the court said:

"In the first place, it may be well to inquire what is the general scope and intent of this constitutional inhibition? *The adjudicated cases, as well as the elementary writers, all concur that it was to prevent the vicious practice of conjoining, in the same bill, incongruous matters, and subjects having no legitimate connection or relation to each other, and in no way germane to the subject expressed in its title; that its object was to prevent surprise or fraud upon members of the Legislature, rather than embarrass legislation by making laws unnecessarily restrictive.* [Cooley on Const. Lim., 174; City of St. Louis v. Tiefel, 42 Mo. 590.]" (Italics ours.)

Here we have in a nutshell the mischief to be remedied by the constitutional provision under consideration.

In St. Louis v. United Rys. Co., 263 Mo. 387, 452, we said:

"But in this case, the title of the amendatory act is sufficient. It amply indicates the subject-matter of the act amended, and the nature and purpose of the amendments; under this insignia the reader will not fail to understand the purport of the ordinance, and this is all that is required, for has this court not said: 'It is only necessary that the title shall indicate the subject of the act in a general way without entering into details,' because 'sound policy and legislative convenience dictate a liberal construction' in the titles of statutes. [State v. Whitaker, 106 Mo. 59, 70; St. Louis v. Weitzel, 130 Mo. l. c. 616; St. Louis v. Liessing, 190 Mo. 464, 490.]"

In Coffey v. Carthage, 200 Mo. 616, 621, we said:

"While the matter of change of venue is not mentioned in the title to the act, it certainly has a natural connection therewith, and it has always been held by the

court that such provisions in a law are valid. Thus, in State ex rel. v. Mead, 71 Mo. 266, it was said that 'a provision in an act "concerning popular elections" authorizing the Governor to fill vacancies in elective offices, is germane to the general subject and is valid.'

"So it was held in the case of Ewing v. Hoblitzelle, 85 Mo. 70, that a statute providing for the registration of voters and to govern elections and to create the office of recorder of votes, contained but one subject and in that case it was said that an act containing provisions relating to matters which are germane to the general subject is not obnoxious to the constitutional inhibition that 'no bill shall contain more than one subject.' To the same effect are State v. Bennett, 102 Mo. 356; Lynch v. Murphy, 119 Mo. 163, and cases cited. It is not at all necessary to the validity of an act of the legislature that it embrace every detail of legislation embraced in it, but all the Constitution requires is that the subject embraced in the act shall be fairly and naturally germane to that recited in the title, and we think such is the case with respect to the provision of the act in question."

The title to the act under consideration in the Coffey Case reads (page 621): "An act in relation to the 25th Judicial Circuit, dividing the court into two divisions, providing two judges for the transaction of the business of said court, for the appointment of an additional judge and fixing the salary of said judges."

It goes into particulars, but is silent on the matter of change of venue.

Similar rulings were made in State ex rel. Wiles v. Williams, 232 Mo. 56, 75, 76; Booth v. Scott, 276 Mo. 1; Asel v. Jefferson City, 229 S. W. 1046, 1048, and State ex inf. Barrett v. Imhoff, 291 Mo. 603, decided at the present term. In the Asel Case, the rule is clearly stated by ELDER, J., page 1048:

"Furthermore, so long as the title does not cover legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection, it is not subject to objection for gen-

erality. [City of St. Louis v. Tiefel, 42 Mo. l. c. 592; Lynch v. Murphy, 119 Mo. 163, 24 S. W. 774.]''

Booth v. Scott, supra, clearly illustrates the rule. The title to the act there under consideration reads: "An act to repeal Section 1025, R. S. 1919, and to enact a new section in lieu thereof," said section being a part of the chapter on private corporations and relating to foreign corporations. It was held that the title was broad enough to authorize a provision in the act making incorporators liable as partners for the debts of the corporation if it should appear that the corporation was organized under the laws of a foreign state by citizens and residents of Missouri for the purpose of avoiding the laws of this State.

The contention that the title to the act in question goes into particulars is without merit. The cases cited have no relevancy. This will appear from the following excerpts from the opinion of WALKER, P. J., in State v. Sloan, 258 Mo. 305, l. c. 313:

"The purpose of a title is to serve as a clear and comprehensive indicator of the purport of the act. While it may be so general in its terms as to omit reference to or the expression of matters germane to the principal features of the statute, if it sufficiently indicates the substantial purpose of the law, it will not be violative of the Constitution; but where a title descends to particulars and specifies a certain class included within the provisions of the act, to the exclusion of others, it does not sufficiently indicate the purport of the law, and is to that extent violative of the constituional provision.

"We find, therefore, in the case at bar that the body of the act contains provisions applying to residents as well as non-residents of the State, while its title, as definitely as words can convey their meaning, limits its application to non-residents; under this state of facts, much as the court may be disinclined to declare the act invalid, it cannot in the face of the plain provisions of the Constitution, (Sec. 28, art. 4) do otherwise in so far as it is attempted to apply the act to residents of this State.

The following authorities are apposite: In State v. Rawlings, 232 Mo. 1. c. 557, it is held that where the title of an act descends into details and attempts to point out a particular class of persons to which the law is intended to apply, it will not support a law leveled against a wholly different class of persons not mentioned in such title; and in State v. Great Western Coffee & Tea Co., 171 Mo. 634, it was held that a title leveled only against manufacturers of certain baking powders would not support a statute prohibiting persons from selling such baking powders; and in St. Louis v. Wortman, 213 Mo. 131, the title purported to 'create the office of dairy commissioner and define his term, duties and powers' and it was held this would not give validity to a section which sought to prohibit individuals from selling impure dairy products; so in State v. Fulks, 207 Mo. 26, it was held that the title which referred only to the sale of intoxicants was not broad enough to authorize a provision in the body of the act prohibiting the giving away of intoxicants.''

The act in question is clearly in harmony with Section 28 of Article IV of the Constitution. It contains no more than one subject, which is clearly expressed in the title. The provision authorizing the Governor to remove the Commissioner for inefficiency, neglect of duty or misconduct in office is germane to, and has an obvious connection with, the subject expressed in the title.

III. That Section 5995 is void because it is in violation of Article III of the Constitution, in that it attempts to invest the executive department with judicial authority. The act complained of was an administrative, not a judicial, act.

Judicial Power.

In State ex rel. Murphy v. Burney, 269 Mo. 602, we held that the Board of Police Commissioners of Kansas City, in hearing complaints lodged against policemen for misconduct, does not sit and act in a judicial capacity, but in an administrative capacity.

In State ex rel. v. Wells, 210 Mo. 601, we held that the Mayor of St. Louis, in hearing and determining

charges against the Commissioner of Public Buildings, and in removing him from office for incompetency and neglect of official duty, does not act as a judicial officer. and he is not prevented by the Constitution from re moving the officer, though in the hearing he may pursu·, *quasi*-judicial methods. At page 610, Fox, J., said:

"Upon these provisions of the Constitution learned counsel for appellant predicates his contention and seeks to draw the conclusion that, inasmuch as the mayor is an executive officer, he cannot exercise the powers of the judge. It is sufficient to say upon that insistence that in contemplation of the provisions of the Constitution, wherein it vests the judicial power in the courts of the State, the mayor is not a judicial officer, nor under the terms of the Constitution is he to be denominated a judge in any way connected with the judicial department of the State. Manifestly one to be a judicial officer must in some way be connected with the judicial department. Judges of judicial tribunals contemplated by the Constitution must be the presiding officers of some tribunal whose jurisdiction or power is defined or prescribed by the Constitution or laws made thereunder."

Again at page 614:

"It is earnestly insisted that the mayor was disqualified from hearing complaints against the relator which had been preferred by the secretary to the mayor. With all due respect to the learned and esteemed counsel for appellant, we are unable to give our assent to this insistence. As already stated, the charter provisions imposed the duty upon the mayor to see that the laws of the city and ordinances of the city are respected and enforced. In other words, it is made his duty to see that the officers appointed by him are not derelict in the discharge of their duties, and the mere fact that his secretary prefers the charges against one of the officers in one of the departments, or even if the mayor should make out the charges himself, it by no means follows that he is prejudiced or biased or has any other interest in the proceedings than to ascertain whether or not the

294 Mo.—4

charges are true. The mayor has certain duties imposed upon him and he is entitled to the presumption that he will conscientiously and in good faith discharge those duties. It certainly would be a very violent presumption that the mayor of a great city in the investigation of charges against officials acted from spite or any other improper motive. The only presumption that can be indulged, in the absence of any showing to the contrary, is that he is acting in obedience to the commands of the organic law of the city of which he is the chief executive."

Relator's contention that the statute in question makes the Governor informer, prosecuting witness, prosecuting attorney, judge, jury and executioner, and that from his findings no appeal is allowed; that such legislation is obnoxious to Article III of our Constitution, which divides the powers of the government into three distinct classes, the legislative, the executive and the judicial, each of which shall be confided to a separate magistracy, is disposed of by the excerpts from the opinion of Judge Fox. It is the general rule that, although a statute authorizing the removal of an officer by the Governor or other executive officer, contemplates an investigation by such officer of the grounds of complaint and the formation of a judgment by him, such action is of an executive and not of a judicial nature. [12 C. J. 899.]

IV. That the so-called hearing before the Governor was so conducted by him as to constitute a denial to relator of the right secured to him by Section 30 of Article II of the Constitution of Missouri, and the attempted removal of relator from the office of Warehouse Commissioner was void for that reason.

*Due Process.*

Section 30 of Article II: "That no person shall be deprived of life, liberty or property without due process of law."

"A public office is a public trust;" it is a public agency solely for the good of the public, which, unless

otherwise provided in the Constitution, may be abolished or regulated by statute. Nevertheless, one who has been elected or appointed to a public office has a right to exercise its functions and enjoy its emoluments during the term for which he was appointed or elected, unless sooner removed in accordance with the provisions of the law. Whoever undertakes to remove such an one must be able to put his finger on the law authorizing such action. [State ex rel. Henson v. Sheppard, 192 Mo. 497, 509; State ex rel. Mosconi v. Maroney, 191 Mo. 531, 545.]

Section 5995 provides that the Governor may remove the Commissioner for inefficiency, neglect of duty, or misconduct in office, giving him a copy of the charges and an opportunity of being publicly heard in person or by counsel in his own defense, upon not less than ten days' notice. The relator accepted his appointment subject to removal as provided in the section. It was as much a condition of his appointment as if the statute had been written into his commission. The respondent contends that the relator was given a public hearing in person and by counsel, in his own defense. The facts stipulated show that the Governor read the charges and stated that the proof of some of the charges was in a certain record of what was known as the Private Inspection Fund, and that other proofs were in certain other specified documents which the Governor said he had examined. The relator testified and was followed by other witnesses. The hearing continued from ten a. m. of June 11th until about two a. m. of the following day, when the Governor refused to adjourn the hearing for the taking of depositions and the production of other witnesses, announced that the charges were sustained, and thereafter prepared and filed his findings, whereby he removed relator from office.

The statute does not provide the procedure to be followed at the hearing, nor make the procedure in the trial of civil or criminal cases in our courts applicable to such hearings. The contention is that the Governor should have first introduced the evidence on which he

relied for proof of the charges preferred, so that the relator would have been informed thereof before being put on his defense. Without doubt that is the orderly procedure in the trial of a civil case, but the statute has not so provided in hearings of this character. The act says that the Commissioner shall have an opportunity to be heard.

If relator's contention be conceded; if he had the right to have the Governor make out the case, *in limine*, and had stood mute, and we had the power to review the Governor's action, the case would present a live question. But relator cannot play fast and loose. When he offered his testimony and that of his witnesses, he clearly abandoned his contention, waived his right in the premises and cannot now be heard to complain of the alleged irregularity.

Take the first charge preferred by the Governor; that relator was denied by the Supreme Court an allowance out of the State Treasury of $157.40 for traveling expenses outside of the State, yet he charged this item to the private inspection fund, the surplus of which is due to the State.

In State ex rel. Bradshaw v. Hackman, State Auditor, 276 Mo. 600, decided by Court in Banc, January 25, 1919, relator sought a writ of mandamus against the Auditor to compel the allowance and payment of this identical item for traveling expenses to Washington, D. C., in March, 1918, in connection with his official duties. In the opinion by FARIS, J., in which all concurred, it was held that travel outside of the State at its expense is not authorized by the statute. It is specifically charged that, notwithstanding this ruling, the relator charged this amount to the private inspection fund and reference is made to the book and page of the record and the number of the check. Various other items of like expenses for traveling outside the State are charged to have been paid by the relator out of this fund. It appears from the stipulation that relator was on the witness stand in his own defense for two hours and a half, and introduced other witnesses; that he had a hearing from ten a. m.

of June 11th until nearly two a. m. of the following day; that he concluded his personal testimony and demanded and was refused a postponement of the case to permit him to take depositions and produce other witnesses from various parts of the State to testify to the effect that the charges preferred are not well founded. By Governor Hyde: ''Just take this for the purpose of this hearing: It will be admitted that witnesses could be produced who will testify as stated.'' Relator then asked an opportunity to produce other witnesses or the depositions of witnesses at various and numerous parts of the State who knew and will testify that relator's management of the department in the places where they are familiar with the conditions has been honest, efficient, economical and satisfactory to them.

The relator knew whether or not he paid himself out of the private inspection fund for the traveling expenses specified in the charges. He testified at length. It must be assumed that his testimony was relevant to the charges. What was his testimony? Did he admit or deny the charges? The abstract of the record prepared by the relator does not set out his testimony as to any of the charges nor that of any other witness who testified at the hearing. We are therefore unable to review the case or to find that the refusal to postpone the hearing was an abuse of the Governor's discretion. In fact we are not asked to review the evidence, but to say, in the absence of the evidence adduced, that in refusing the postponement he was denied a hearing, and that his removal from office was without due process of law.

Relator offered, if given further time, to prove by witnesses that his management of the department had been honest, efficient, economical and satisfactory *to them* (the witnesses). These offers were of more opinions and conclusions, having no relevancy to the questions at issue. There was no definite offer of proofs. Moreover, the Governor said that it would be admitted that witnesses could be produced who would testify as

stated by the relator. In the absence of the evidence so heard by the Governor, which the relator has not seen fit to produce, must we not assume that a case was made warranting the relator's removal? Assuming, as I think we must, that there was evidence to sustain the charges, what would it have availed the relator if the hearing had been postponed? However, under the agreement that the evidence relator desired to introduce would be considered, he had the benefit of his tender, which, as we have seen, were mere opinions and conclusions. But before the Chief Executive can be convicted of abuse of discretion in the premises, we must have the evidence which the relator has not seen fit to incorporate in his abstract. However, as heretofore stated, we are not asked to review the evidence, but to hold that removal of relator from office was without due process of law. On this record we cannot so hold.

V. The fundamental question, however, is: Has this court jurisdiction to review or set aside **Judicial** an administrative or executive act of the Gov-**Review of** ernor in a matter in which he has exclusive **Governor's** **Acts.** jurisdiction?

Article III of our Constitution reads:

"The powers of government shall be divided into three distinct departments—the legislative, executive and judicial—each of which shall be confided to a separate magistracy, and no person, or collection of persons, charged with the exercise of powers properly belonging to one of those departments, shall exercise any power properly belonging to either of the others, except in the instances in this Constitution expressly directed or permitted."

Section 5995, Revised Statutes 1919, empowers the Governor or the Legislature to remove the Commissioner after notice and a hearing. Has the Constitution set this court above the Governor in any matter in which it has charged him with an official duty? The legislative, executive and judicial powers of the State are each confided to a separate magistracy. Each department of the State

is forbidden to exercise any power properly belonging to either of the other departments, except in the instances in the Constitution expressly directed or permitted. The Supreme Court has a general superintending control over all inferior courts, but is given no control or supervision of the other departments of the State. The Governor is as independent of the courts as the courts are independent of the Chief Executive. Any other theory leads to chaos. The Chief Executive and the Judiciary are answerable to the people and "shall be liable to impeachment for high crimes or misdemeanors, and for misconduct, habits of drunkenness or oppression in office." [Art. VII, sec. 2, Constitution.] If this court can review and set aside an executive or administrative act of the Governor, then it is clear that the executive department is not a distinct and independent department of the government.

In 12 Corpus Juris, p. 897, sec. 399, it is said:

"Executive officers, intrusted by the Constitution or by statute with the power of appointment to office, are not subject to judicial control in the exercise of their discretion in selecting appointees. In like manner, the courts may not interfere with the removal of an officer where full power of removal has been vested by law in the Governor or other executive officer."

In Hartranft's Appeal, 85 Pa. 433, 445, 27 Am. Rep. 672, in considering the prerogatives of the governor, it is said:

"In other words, if, from such analogy, we once begin to shift the supreme executive power from him upon whom the Constitution has conferred it, to the judiciary, we may as well do the work thoroughly and constitute the courts the absolute guardians and directors of all governmental functions whatever. If, however, this cannot be done, we had better not take the first step in that direction. We had better at the outstart recognize the fact, that the executive department is a co-ordinate branch of the government, with power to judge what should or should not be done, within its own department, and what of its own doings and communica-

tions should or should not be kept secret, and that with it, in the exercise of these constitutional powers, the courts have no more right to interfere, than has the executive, under like conditions, to interfere with the courts.''

In State ex rel. Robb v. Stone, 120 Mo. 428, 432, SHERWOOD, J., said:

''In this instance we, constituting a portion of the judicial department of the government, are called upon to exercise, or what amounts to the same thing, to *control* the exercise of powers belonging exclusively to the *executive* department of that government. To such action on our part the organic law interposes an insuperable barrier. In addition to the provisions of the organic law quoted, that instrument also declares that 'the supreme executive power shall be vested in a Chief Magistrate, who shall be styled ''the Governor of the State of Missouri.'' ' [Const., art. 5, sec. 4.] Section 6 of the same article requires that 'the Governor shall take care that the laws are . ' . . faithfully executed.' Of the same article, Section 1 provides that the Governor 'shall perform such duties as may be prescribed by law.' And Section 6 of Article 14, as a prerequisite to his entering on the duties of his office, prescribes that he 'take and subscribe an oath to support the Constitution of the United States and of this State, and to demean himself faithfully in office.'

''Under these plain and comprehensive provisions, it must be apparent that any duty *'prescribed by law'* for the Governor to perform, is as much a part and parcel of his executive duties as though made so by the most solemn language of the Constitution itself.

''Conceding the validity of any given law, the fact that the duties which it prescribes are merely *ministerial* can not take them out of the domain of *executive* duties, nor make them any the less those which 'properly belong' to the executive department of the government. And should we by our process be able to compel the performance by the Governor of such duties, we would in effect and to all intents and purposes *be performing those*

*duties ourselves;* for there can be no substantial distinction drawn between our assumption of duties pertaining to another department of the government and our intervention resulting in the compulsory performance of such duties; *qui facit per alium*, etc.''

Again, on page 437:

''If, however, we have no jurisdiction over the Chief Magistrate, his consent will not confer it on us. We will not 'assume a jurisdiction if we have it not;' we will not sit as a *moot court* and pass upon questions and enter judgment thereon which we are powerless to enforce. 'For all jurisdiction implies superiority of power; authority to try would be vain and idle without authority to redress; and the sentence of a court would be contemptible, unless that court had power to command the execution of it.' [1 Cooley's Blackstone, 242.]

''As we do not possess any jurisdiction over the Governor, we shall decline any further discussion of this cause, hold the demurrer well taken and deny the issuance of the peremptory writ. All concur.''

In State ex inf. v. Crandall, 269 Mo. 44, 57, this court said:

''Here, as has been shown, the power to remove was inserted in the statute and rests in the discretion of the Governor upon prescribed grounds, the existence of which he is allowed to determine to his own satisfaction. The return shows that the reasons given for his action were in strict conformity to the statutory power. He was thus possessed of jurisdiction to act, and his exercise of that jurisdiction was the discharge of an *executive* duty imposed on him as the Governor of the State, which is not reviewable by the courts. [State ex rel. v. Stone, 120 Mo. l. c. 433-4.]''

In State ex rel. Major v. Shields, 272 Mo. 342, we prohibited the circuit court judge from hearing and determining a suit for the purpose of recovering damages against a former governor of this State on account of his refusal to issue a commission to one elected to the office of clerk of the circuit court of the city of St. Louis.

So far as it appears, the refusal to issue the commission was arbitrary and indefensible. WALKER, J., at page 346, said:

"It will suffice to say that the germinal idea of a government of three coordinate branches is first found recorded in Aristotle's Politics where it is said that 'in every polity there are three departments: first, the assembly; second, the officers, including their powers and appointment; and third, the judging or judicial department.' The wisdom of this classification and its appropriate application in the framing of the laws of a free government has been illustrated by its incorporation into our national organic law and subsequently into the constitutions of the several states. The central idea in the creation of a government of this form is that the powers created shall be coordinate in their relations toward each other; and while supreme within their respective orbits they shall so move as not to invade the plane of activity of the others. Thus regulated, friction in the conduct of public affairs is avoided and that harmony promoted which is most conducive to the stability of government and, as a consequence, to the welfare of the people."

After approving the ruling in the Stone Case, supra, Judge WALKER continued at page 347:

"What is meant by ministerial duty, as applied to judicial action, is usually not difficult of determination; but it is otherwise when it is attempted to thus classify executive duties. They are usually clearly defined and the power of their performance confided exclusively to the Governor. In their exercise a degree of discretion is necessarily required. They demand, therefore, no interpretation, and are not subject to judicial control. If control is attempted to be exercised, under such a state of facts, it cannot prove otherwise than an invasion of power, and hence contrary to the spirit and purpose of the law separating the government into three branches and defining the powers of each."

And it is generally held that the exercise of the power of removal by the Governor, being an executive

act, is due process of law and cannot be reviewed by the courts. [State ex rel. v. Hawkins, 44 Ohio St. 98, 113, 5 N. E. 228; State ex rel. v. Hay, 45 Neb. 321, 329; Wilson v. North Carolina, 169 U. S. 586, 593; State ex rel. v. Ansel, 76 S. C. 395, 57 S. E, 185; Keenan v. Perry, 24 Tex. 253; Cameron v. Parker, 2 Okla. 277, 38 Pac. 14.]

The Governor had jurisdiction. That being conceded, it follows that this court has no power to review his action.

The writ of ouster is denied. *David E. Blair* and *Elder, JJ.,* concur; *James T. Blair, C. J.,* concurs in separate opinion, in which *Higbee, David E. Blair* and *Elder, JJ.,* concur; *Woodson, J.,* dissents in separate opinion in which *Walker, J.,* concurs; *Graves, J.,* dissents in separate opinion, in which *Walker, J.,* concurs.


JAMES T. BLAIR, C. J. (concurring).—The regulation of the warehousing and inspection of grain was first established by the Act of June 22, 1889. [Laws 1889, p. 124 et seq.] The title to this first enactment was:

"An Act to increase the duties of the Board of Railroad Commissioners, changing the name of said board, providing for the organization of public warehouses, and to regulate the warehousing and inspection of grain in public warehouses in the State of Missouri."

By this act the name of the then "Board of Railroad Commissioners" was changed to the "Board of Railroad and Warehouse Commissioners," and the board was charged with the duties of warehouse regulation and grain inspection. The second section of the Act of 1889 required the board to appoint a "chief grain inspector" whose term of office was fixed at two years and whose duty it was to have general supervision of the inspection of grain. He was empowered to nominate, for appointment by the Commission, a sufficient number of suitable persons for positions as deputy chief inspectors, and as assistant inspectors. Section 40 of the act provided for the removal of any such appointees for stated causes.

Title of Act.

In the features mentioned, in so far as questions here are concerned, the Act of 1889 was carried forward, with the addition of hay inspection, in substantially the same form until the passage of the Act of 1913. By that act, Article 2 of Chapter 60 of the Revised Statutes of 1909, relating to the inspection of grain and hay, was repealed, and a new article enacted in lieu thereof. The title of the Act of 1913 (Laws 1913, p. 354) is as follows:

"An Act to repeal Article 2 of Chapter 60 of the Revised Statutes, 1909, relating to inspection of grain and hay, and to enact in lieu thereof a new article, to be known as Article 2, relating to inspection and weighing of grain, abolishing the office of Railroad and Warehouse Commissioners, creating the office of Warehouse Commissioner and fixing his powers and duties, with an emergency clause."

By Section 2 of the Act of 1913 (Sec. 5993, R. S. 1919) "the office of Railroad and Warehouse Commissioner" was abolished and the office of "Warehouse Commissioner" established. Section 3 of the act (R. S. 1919, sec. 5994) provides for the appointment and tenure of the Warehouse Commissioner and for filling vacancies. Section 4 of the act (Sec. 5995) provides for the removal of such official for stated causes and prescribes the procedure therefor.

In the new act and old, *mutatis mutandis,* the provisions concerning the appointment and removal of chief inspector and assistant inspectors are alike.

Among other things, relator earnestly contends that the provisions purporting to empower the Governor to remove the Warehouse Commissioner for stated causes are invalid because they are not within the subject clearly expressed in the title.

Are the provisions for removal invalid when tested by the requirements of Section 28 of Article IV of the Constitution? The quotation of some additional statements of the general rules applicable to the determination of this question, though they have been often repeated, does not seem out of place. This court early approved

the doctrine that "the unity of object is to be looked for in the ultimate end designed to be attained, not in the details leading to that end," and that "there must be but one subject; but the mode in which the subject is treated and the reasons which influenced the Legislature cannot and need not be stated in the title, according to the letter and spirit of the Constitution." [City of St. Louis v. Tiefel, 42 Mo. l. c. 591.] In that case the reasons which prompted the adoption of the constitutional provision in question were learnedly discussed, and the court, at page 590, summed up the matter thus:

"But while the clause was embodied in the organic law for the protection of the State and the Legislature, it was not designed to be unnecessarily restrictive in its operation, nor to embarrass legislation by compelling a needless multiplication of separate bills. It was only the intention to prevent the conjoining in the same act of incongruous matters and of subjects having no legitimate connection or relation to each other."

The title considered there was: "An Act to enable the City of St. Louis to procure a supply of wholesome water." This title covered the creation of a board of water commissioners and, "as a consequence," a definition of its powers, duties and responsibilities, and certain penalties for failure to take out license to use and pay for water after the board had announced its readiness to furnish it. The court held the penalties within the title. In State v. Mathews, 44 Mo. 523, the title was, "An Act to create an insurance department." The act empowered the Superintendent of Insurance to require certain information from the companies. It was held that the doctrine of the Tiefel Case, that matters necessary to make the act effectual were within the title, was sound. A Michigan decision was approved (l. c. 527) in which it was held that under the title, "An Act to establish a police government for the City of Detroit," all "matters properly connected with the establishment and efficiency of such a government, including taxation for its support, and courts for the examination and trial of

offenders, might constitutionally be included in the bill under this general title.'' In State v. Miller, 45 Mo. 1. c. 499, the court warned against ''too vigorous and technical a construction'' and declared that if ''we should follow the rules of a nice and fastidious verbal criticism, we should often frustrate the action of the Legislature without fulfilling the intention of the framers of the Constitution.'' In State v. Bank, 45 Mo. 1. c. 537, the same rule was applied. ''The constitutional provision simply requires that the title shall give information of the general subject of the act, and that the act shall not contain provisions in no wise pertaining to that general subject.'' [In re Burris, 66 Mo. 1. c. 446.] ''It was not the purpose'' of the Constitution, ''however, to require that the title of an act should refer literally to all the details which the general subject would suggest.'' [City of Hannibal v. County of Marion, 69 Mo. 1. c. 575; Frost v. Wilson, 70 Mo. 664; Luther v. Saylor, 8 Mo. App. 1. c. 430.] In Coca Cola Bottling Co. v. Mosby, 289 Mo. 1. c. 472, 233 S. W. 1. c. 448, this court ruled:

''The State Constitution (Sec. 28, art. 4) is read to little purpose if it be held to require that the title of an act must present the particularity of an itemized account or the minutiae of a chemical analysis. When the Constitution provides, therefore, that no bill shall contain more than one subject, which shall be clearly expressed in its title, it simply means that the title shall indicate in an unmistakable manner the general contents of the act; it does not require nor was it intended that it should descend into particulars, but that it will be sufficient if it defines the nature of the statute and thus informs the reader as to its purpose. The nature of this constitutional provision being thus understood, the tendency of the courts in numerous rulings has been to construe it liberally in aid of all well directed legislative power.''

With respect to formulated rules for determining whether a statutory provision is germane to the general subject expressed in the title, this court has frequently

approved that laid down by Sedgwick on Statutory Construction, p. 521n: ''When all the provisions of a statute fairly relate to the same subject, have a natural connection with it, are the incidents or means of accomplishing it, then the subject is single; and if it is sufficiently expressed in the title, the statute is valid.'' [Ewing v. Hoblitzelle, 85 Mo. l. c. 71; State ex rel. v. Miller, 100 Mo. l. c. 445, and cases cited; Elting v. Hickman, 172 Mo. l. c. 252.] It has also approved the rule formulated on this subject by Mr. Bishop (Statutory Crimes) as follows: ''The title need indicate the subject only in a general way, without entering into details; and all auxiliary provisions properly attaching to it, and constituting with it one whole, may be embraced within the enactment.'' [State v. Bockstruck, 136 Mo. l. c. 353.]

It is also the law of this State that the principle that an act will not be held to be unconstitutional unless it appears to be so beyond a reasonable doubt, applies to questions concerning the sufficiency of titles of acts. [Forgrave v. Buchanan County, 282 Mo. l. c. 604, 605; Ex parte Loving, 178 Mo. l. c. 203, et seq.]

Is a provision for removal of the Warehouse Commissioner germane to the subject expressed in the title of the Act of 1913? The purpose to establish the office of Warehouse Commissioner is expressly stated in the title. Relator and respondent in this case both claim title to the office under appointment by the Governor under the power given him by the act in question. They both thereby affirm that the act validly establishes the office and authorizes the Governor to appoint and, by necessary implication, that the title is sufficient to cover and authorize the enactment of the provisions relating to these two things. For the purposes of this case it seems safe to assume that relator will not deny the soundness of this conclusion. Since the title authorized the enactment of a provision for appointment by the Governor, it included such enactment as a part of the subject it clearly expressed. Now, it appears, practically to the point of demonstration, that when the Legislature has

proceeded to the point that it has determined to create an office and provide for the appointment of an officer, the question of the power to remove becomes not merely germane to the subject, but obtrudes itself as an essential component of the situation.

If the simple power to appoint is conferred and no term is fixed by law and nothing else appears, then the appointee may be removed at pleasure, by the appointing authority, without notice, the preferment of charges or the assignment of reasons. [Throop on Public Officers, sec. 354; Mechem's Public Officers, sec. 445.] The reason of the rule is found in the unreason of its alternative, which, as Mr. Mechem says, would be that the tenure of such appointee then would be "subject to no will but his own;" i. e. he would, in such case, hold at his own pleasure, a predicament in which courts have refused to place the public. This is the law in this State. In State ex rel. Campbell v. Police Commissioners, 14 Mo. App. l. c. 302, it was said: "It is not disputed that the power of removal at pleasure is incidental to the power of appointing, in the absence of any inconsistent limitation in the law which creates the authority to appoint." This decision was fully approved by this court on appeal. [88 Mo. l. c. 145.] In another particular this case was disapproved in State ex rel. v. Johnson, 123 Mo. l. c. 51, but the language above set out was approvingly quoted and the rule it states was applied as decisive of the case then under consideration. The same rule was followed in State ex rel. v. Alt, 26 Mo. App. l. c. 676. In this case a formulation of the rule by Thayer, J., then on the circuit bench, was approved. Other decisions are in point. [State ex rel. v. Brown, 37 Mo. App. l. c. 204; Horstman v. Adamson, 101 Mo. App. l. c. 124, 125, and cases cited; State ex inf. v. Crandall, 269 Mo. l. c. 51.] A like principle is approved in State ex rel. v. Stonestreet, 99 Mo. l. c. 377; State ex rel. v. Hawes, 177 Mo. l. c. 378. The rule is said to be "universal" in 29 Cyc. pp. 1370, 1371, 1408; and "general" in 22 R. C. L. secs. 266, 267, pp. 562, 563; and "uniform" in note to Wright v. Gamble,

136 Ga. 376, in Ann. Cases, 1912C, p. 374, et seq. Numerous authorities are cited in this note—State, Federal and English. Others may be found in note to Trainor v. Board (Mich.) 15 L. R. A. 95. It is suggested in 22 R. C. L. sec. 266, p. 562, that this rule "does not appear to apply to governors of states." An examination of the cases cited in this connection shows that the suggestion really depends upon Dubuc v. Voss, 19 La. Ann. 210. What was said in that case which was thought to be upon the present question is *obiter,* if so construed, as well as opposed to all other decisions, as is pointed out in note in 15 L. R. A., to which reference has been made.

It thus appears that when the Legislature provides for the appointment of one official by another, if it does nothing more, adopts no means to forestall it, the act authorizing the appointment will inevitably raise the power to remove at pleasure. This power is none the less a part of the act, and none the less within the title because it arises by construction. It is clear that if it is not germane it could not arise out of the power to appoint, because the constitutional provision in that case would invalidate it. It is also clear that the rule itself could not exist except the power arose out of the simple conferring of the power to appoint, since express language authorizing removal at pleasure would leave no reason or ground for implying the power.

This power may be defeated by specific provisions which destroy it or by the fixing of a tenure, which is inconsistent with it. Now, the relator will concede that no right to remove at will exists in this act. It is true the title does not specifically mention a fixed tenure or removal for cause; but if relator is correct in his contention that the removal-for-cause feature is invalid, then the provisions fixing the tenure at four years and that for the consent of the Senate to the appointment are the only remaining provisions which could restrict removal at pleasure. It is, therefore, reasonable to think that relator will not deny that these provisions are germane to the subject expressed in the title. He could not

long remain in court upon any other theory, in so far as concerns this present question. But the very fixing of tenure is legislation upon the power of removal. It destroys the power which would otherwise exist to remove at pleasure; for such power is necessarily incompatible with a definite tenure. The same thing has been held to be implied from the provision respecting the consent of the Senate.

It, therefore, appears that this title not only does, but must, if relator is not removable at pleasure, cover and authorize express legislation upon the removal of the Warehouse Commissioner; and that in the absence of provisions which exscind the power to remove at pleasure, that power inevitably becomes a part of the act. The Legislature not only could, under the title, lawfully legislate upon the power of removal, but in establishing an office and providing for the appointment of an officer it could not, under the rule in this State and country, by any possibility avoid including in the act authority for removal of one kind or another or a denial of such authority. The power of removal is, therefore, not merely germane to the subject expressed in the title—it is an inseparable part of it. Since the subject of removal is germane and within the title, the means and manner and any valid procedure therefor, under authorities cited, are also within the title. It is argued the title ''descends to particulars'' in such way as to exclude everything except (1) the creation of the office, (2) the fixing of power, and (3) of duties. If this argument is to aid relator he must maintain that this descent into particulars also renders invalid the fixing of the tenure of the office and the requirement as to the consent of the Senate, since these, in themselves, constitute legislation against removal at pleasure. They prevent it. The result of this has already been pointed out. It would put an end to relator's claim. The particulars mentioned do not expressly include a power to appoint. If relator's position on the point is sound, then the Governor's constitutional power to appoint would still leave in force the rule as to re-

moval at pleasure, which has been discussed. It is also suggested that "an expression of intention to create is not a clear expression of an intent to destroy." The provisions for removal in no way destroy or diminish the office the act creates. They affect solely the tenure of the incumbent of the office.

The Act of 1913 is, in a sense, amendatory, and decisions upon questions involving titles of amendatory acts might have some pertinence. Their effect, if any, would be to confirm the result already reached, as an examination of them will show.

The decision in Bell v. District Court, 28 Nev. 280, l. c. 297, 298, upon which relator relies, involved provisions for the removal of an officer elected by the people. There is no incidental power to remove such an officer, and this renders that decision inapplicable to the question here. The reasons already given seem to permit of but one conclusion. The provisions empowering the Governor to remove for causes stated are not rendered invalid by Section 28 of Article IV.

II. Earnestly and ably counsel for relator press the argument that the section providing that the Warehouse Commissioner may be removed from office for stated causes is special and, therefore, void in that it is arbitrarily made to apply to but a part of a class which the reason underlying the section includes.

*Special Law.*

1. The subject of Article 2 of the chapter on inspections is the inspection of grain. The subject of the Act of 1913 is the establishment of the office of Warehouse Commissioner and the fixing of his powers and duties. As already shown, the title includes the subject of the tenure and removal of the Commissioner. It has been pointed out that in establishing a statutory office and providing for appointment thereto, the Legislature not only can but must deal with the matter of removal. If it is true that provisions for removal must be the same in all statutory offices of State-wide jurisdiction, as is

contended, then the tenure of all must be the same, since to fix tenure is to legislate against the removal at will. If this be true, then the provision for an initiatory term of six years in the Act of 1913 was bad, in any event. And would it not be true, under relator's argument, that the fixing of tenure in separate acts would be special and void even though all other inspection acts separately fixed the tenure of the inspectors thereunder? Is the question whether the act assailed includes the whole class, or is it whether that act and other acts, considered together, include it? If the tenure clause is bad because enacted in an act covering the Warehouse Commissioner alone, then the implication against removal by the Governor at pleasure arising out of the requirement that the appointment must be made by and with the consent of the Senate, is bad for the same reason. If these are void and the removal section also void, there remains no obstacle to removal at pleasure by the appointing power. This, if sound, would dispose of relator's claim without further ado. In this connection it is to be kept in mind that the question is not whether relator is denied the equal protection of the laws, but is whether the act is special in the sense of Section 53. It may be so in that sense though every other member of the class to which it applies is subject to like provisions in other special laws. There is no exception to the prohibition that a special law cannot be passed if a general law can be made applicable. It does not except from its condemnation special laws in case other like special laws have been passed respecting all other members of the class. It seems to be true that the argument of relator against the specific removal clause is equally good against all other restrictions upon removal which the act contains, and that removal at pleasure would be left to work its will. Since he must affirm the effectiveness of some restriction upon removal, must he not concede the validity of all?

2. Relator's position necessarily must be that the reason for legislation respecting the creation of the office, the appointment thereto and the tenure of office, is

sufficient to justify the enactment of those provisions though they are applicable to the Warehouse Commissioner alone, but that this reason is not of a character to justify the enactment of separate procedure for the removal of the Warehouse Commissioner. At first blush it would seem that the matter of appointment and tenure and removal and filling vacancies all pertained to the subject of providing a satisfactory incumbent for the office and were incidents, merely, with respect to which the validity of the provisions concerning them might all be upheld for the same reasons. If this is true, then the removal feature is as valid as that providing for the appointment and as that fixing the tenure. There is authority that when the principal provisions of an enactment are based upon sound classification, incidental provisions are justified by that fact and are not to be held void because they, incidents only, cannot be shown to rest upon distinctions adequate to sustain them if they stood alone and independent of the rest of the act of which they form a part. In State ex rel. v. Thurman, 268 Mo. l. c. 543, this court had under consideration the question whether legislation applicable solely to the contest of elections under the Local Option Law was special and, therefore, void. It was there held that since the Local Option Law was good against the objection that it was special, the contest provision, added by amendment in 1909, since it was germane to the subject-matter of the act, was "no more special than the rest of the act."

In Gray v. McLendon, 134 Ga. 224, the court had under consideration the question whether an act providing for the suspension and removal of a railroad commissioner was invalid because special. The applicable constitutional provision was not the same as ours, but the question made was like that in the instant case. The court said: "There is no merit in this contention. The Act of 1879 was in no sense a special law. A statute relating to persons or things as a class is a general law." [Authorities are quoted.] "The Act of 1879 provides for the suspension and removal of all railroad commissioners

in the State, and is in no sense a special law. To hold legislation of this kind void as a special law would establish a principle which, when applied to all acts of the Legislature, would paralyze the legislative branch of the government.''

In Fitzgerald v. New Brunswick, 47 N. J. L. 480, there was involved the constitutionality of a resolution of the common council, of date July 6, 1885, which declared vacant the offices of chief of police and patrolmen in defendant city. It appeared that an act, effective May 25, 1885, restrictive of the power of city councils, had been passed to substitute removal for cause for removal by the council at pleasure. The manner of preferring charges and the course of the hearings were prescribed. It was held that it was applicable to all cities. It was argued that there existed municipalities other than cities but similarly situated with respect to the need for police and the organization and regulation of their police force. The court held that despite this it was settled law that the boroughs mentioned constituted a class for legislative purposes distinct from cities, and held the removal law valid as against the objection that it applied solely to cities and did not apply to boroughs. It is obvious that this decision is not founded upon any difference between the cities and boroughs respecting their police forces which would authorize the classification made. There was no such difference. It is based upon the fact that the cities constituted a class for general municipal purposes separate from that of the boroughs. The gist of the decision is that the fact that the cities did constitute such a separate class made the police-removal law, applicable solely to cities, a general law despite the fact that in another class of municipalities, the boroughs, the same situation with respect to the police existed.

3. It is also held in several decisions that if the Legislature is empowered to create an office, it may provide for removal from that office as it wills. ''In creating an office the government can impose such limitations and conditions with respect to its duration and termina-

tion as may be deemed best, and in such case the incumbent takes the office subject to the conditions which accompany it.'' [In re Carter, 141 Cal. l. c. 320; State v. Houston, 94 Neb. l. c. 453.] Even in case a ''constitution, creates an office but makes no provision for the period of its term or method of removal from it, the power of the Legislature to act in the public interest in these respects is well settled. [Op. of Justices, 117 Mass. 603; Wales v. Belcker, 3 Pick. 508.]''—Opinion of Justices, 216 Mass. l. c. 606.

In case the Legislature is invested with ''power to provide the mode of filling, fix the term and prescribe the duties of such officers, it necessarily follows it may, in its discretion, not only discontinue them altogether, but determine the manner and by what tribunal an incumbent may be removed.'' [Hoke v. Richie, 18 Ky. L. Rep. l. c. 524.] With respect to the office of police commissioner of Denver it was held in Trimble v. People, 19 Colo. l. c. 196, that the Legislature had the power to create the office, provide the method of filling it and the manner of removal from it. In Attorney General v. Tufts, 131 N. E. l. c. 575, the court reaffirmed the doctrine announced in Opinion of Justices, 216 Mass. 605, 606, and quoted with approval from Graham v. Roberts, 200 Mass. 152, 157: ''Where an office is created by law, and one not contemplated, nor its tenure declared by the Constitution, but created by law solely for the public benefit, it may be regulated, limited, enlarged or terminated by law, as the public exigency or policy may require.'' The court also said: ''Even where the Constitution creates an office but makes no provision for its term or the method of removal of its incumbent, the General Court may act in these particulars in the public interest. It may establish any rational means of removal from such office for any just cause.'' In Caldwell v. Wilson, 121 N. C. l. c. 470, it was held that the Legislature in creating the office of railroad commissioner had authority to reserve to itself the power to remove, and to the Governor the power to suspend such official.

4. The same result is reached when the general principles concerning classification are applied to this case.

Special legislation is forbidden, but legislation is not special because it does not apply to all persons and objects in the State. In the nature of things there are classes of persons and objects to which legislation may be applied which, with equal certainty, cannot be made applicable to persons and objects not in such classes. The Constitution may (within the limits of the Federal Constitution) *create* or authorize the creation of classes for the purposes of legislation. [Art. IX.] In a very real sense the Legislature cannot do this. Under our Constitution, in so far as the question in this case is concerned, the Legislature must find in existing circumstances and conditions distinctions pertaining to some of the persons or objects within the State which do not pertain to the rest and which thus delimit a class. Such distinctions must not be arbitrary nor unrelated to the purposes of the contemplated legislation. They must be germane to the reason for the enactment which is to be applied to the class marked out by them. "It is settled law that a classification for legislative purposes 'must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis' . . . and also that the distinction observed in marking the boundaries of the class to which the resulting enactment shall apply must be one which 'is not arbitrary, but rests upon some reason of public policy growing out of the condition of the business of such class' . . .; it 'must be grounded upon a reason of a public nature' and 'must be of such a nature as to mark the objects thus designated as peculiarly requiring exclusive legislation' and 'as well, in some reasonable degree, at least, account for or justify the restriction of legislation.' " [State ex rel. v. Railroad, 246 Mo. l. c. 514, 515; State v. Julow, 129 Mo. l. c. 177; State v. Miksicek, 225 Mo. l. c. 574 et seq.; State ex rel. v. Kimmel, 256 Mo. l. c. 640 et seq.; State ex rel. v. Revelle, 257 Mo. l. c. 540, 541.]

It is sometimes said that the distinctive features which mark out a class as the proper subject of legislation applying to it alone must be such as to give rise to a "necessity" for distinctive legislation, or "require" such legislation. [State ex rel. v. Miller, 100 Mo. l. c. 448.] The words thus used must not be misunderstood to establish a rule that though a class be set off by conditions peculiar to it alone and germane to lawful purposes of legislation, yet laws respecting such classes cannot be enacted validly unless there be an actual *necessity* that they be passed or that their passage is absolutely *required* by existing conditions. Whenever a distinction exists which defines a class and separates it from the whole, the necessity or need or requirement for a law affecting the class alone need be no more compelling than it would have to be to justify a law affecting the whole if the distinctive feature which marks out the class was not distinctive, in that sense, but was a quality of every person and object which makes up the whole. This is recognized, impliedly, in the quotation found at page 499 in the case last cited and, in fact, must be true, so far as concerns this case, unless the courts are to be made the judges of the need for legislation and its propriety as well as its validity—a position not yet taken.

Early in the history of the consideration of the question whether an act was to be held invalid as special legislation and in conflict with Section 53 of Article IV of the Constitution, this court announced that such "question should be approached with great caution and should be considered with the utmost care and deliberation. The nullity and invalidity of such a law must appear beyond a reasonable doubt before we can assume to pronounce it void. The rule is founded on the fact that the judiciary ought to accord to the Legislature as much purity of purpose as it claims for itself; as honest a desire to obey the Constitution, and, also, a high capacity to judge of its meaning." [Ewing v. Hoblitzelle, 85 Mo. l. c. 70; State ex rel. v. Wofford, 121 Mo. l. c. 68; State ex inf. v. Southern, 265 Mo. l. c. 284; Ex parte Loving, 178 Mo.

1. c. 203; Commissioner ex rel. v. Smith, 4 Bin. 117; Byrne v. Stewart, 3 Desauss. 1. c. 476-477; Ogden v. Saunders, 12 Wheat. 213; Dartmouth College Case, 4 Wheat. 518.] This court long ago approved the doctrine that the validity of a legislative classification does not depend upon numbers. [State ex rel. v. Tolle, 71 Mo. l. c. 650.] If all the members of a class with respect to which separate legislation is permissible are included, that is sufficient whether the members of the class are many or few. [State ex rel. v. Gordon, 245 Mo. l. c. 31, et seq.; State ex inf. v. Southern, supra; Elting v. Hickman, 172 Mo. l. c. 257.]

A general law may include all persons. Such inclusion is justified when the situation or condition of all is alike with respect to the feature which calls the law into being. But a law is not necessarily special because it does not include all persons. It is not necessary that it shall include a majority. No court has attempted to fix a per cent of the population, or objects or places within a state, below which a legislature may not go in respect to the number of persons, objects or places in a class to which a general law is made applicable. Number is not the test. The basis of sound legislative classification is similarity of situation or condition with respect to the feature which renders the law appropriate and applicable. A law may not include less than all who are similarly situated. If it does, it is special and, therefore, invalid, because it omits a part of those which in the nature of things the reason of the law includes. The question is not whether, considering all the circumstances which exist, the Legislature might not constitutionally make a law which would include a larger class. On the contrary, it is whether it appears beyond a reasonable doubt that there are no distinctive circumstances appertaining to the class with respect to which it has legislated which reasonably justify its action in restricting the operation of the law to the persons, objects or places to which the law is made applicable. To illustrate, concede the Legislature might pass an act providing procedure for the re-

moval of all statutory officers of state-wide jurisdiction; but this does not necessarily preclude it from providing such procedure applicable to a part only of such officers, if with respect to that part there is some difference, in the condition or situation, of such character as reasonably to distingush them from the rest with respect to the matter of the regulation of removal from office. [State ex rel. v. Gordon, 245 Mo. 1. c. 33.]

"Legislative classification does not have to be so broad and comprehensive as to include all the evils which might by possibility be brought within its terms. Classification must be accommodated to the problems of legislation, and must be palpably arbitrary to authorize a judicial review of it. It cannot be disturbed by courts, unless they can see clearly that there is no fair reason for the law that would not require with equal force its extension to others, whom it leaves untouched. It is competent for a legislature to determine upon what differences a distinction may be made, for the purpose of statutory classification, between objects otherwise having resemblance, though such power cannot be arbitrarily exercised, and the distinction must have a reasonable basis." [Stewart v. Brady, 133 N. E. 1. c. 314.] In that case is quoted, with approval, from International Harvester Co. v. Missouri, 234 U. S. 199, language to the effect that on a question like this the court is inquiring concerning the power of the legislature, and not investigating the wisdom of legislative policy. With respect to the rules governing judicial inquiry into legislative power, the court, in Stewart v. Brady, expresses itself as follows:

"So in Chicago, Burlington & Quincy Railway Co. v. McGuire, 219 U. S. 549, 31 Sup. Ct. 259, 55 L. Ed. 328, it is said:

" 'The scope of judicial inquiry in deciding the question of power is not to be confused with the scope of legislative considerations in dealing with the matter of policy. Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best

means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the Legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance.'

"The contention as to the various omissions which are noted in the objections here urged ignores the well-established principle that the Legislature is not bound, in order to support the constitutional validity of its regulation, to extend it to all cases which it might possibly reach. Dealing with practical exigencies, the Legislature may be guided by experience. [Patsone v. Pennsylvania, 232 U. S. 138-144.] It is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be clearest. As has been said, it may 'proceed cautiously, step by step,' and 'if an evil is specially experienced in a particular branch of business,' it is not necessary that the prohibition 'should be couched in all-embracing terms.' [Carroll v. Greenwich Ins. Co., 199 U. S. 401-411.] If the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied. Keokee Consol. Coke Co. v. Taylor, 234 U. S. 224-227.' [Miller v. Wilson, 236 U. S. 373, 35 Sup. Ct. 342, 59 L. Ed. 628, L. R. A. 1915F, 829.]

"One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. A distinction in legislation is not arbitrary, if any state of facts reasonably can be conceived that would sustain it, and the existence of that state of facts at the time the law was enacted must be assumed. [Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 Sup. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160.]''

In the matter of classification for the purposes of legislation, the Legislature has a broad discretion and that discretion cannot be revised by the courts merely

because it may be thought it has been unwisely exercised. It is only when it appears beyond a reasonable doubt that the classification is arbitrary and that there is no peculiarity in the condition of the members of the constituted class which justifies their segregation for legislative purposes that courts can interfere. [State ex rel. v. Railroad, 246 Mo. l. c. 514.] The question must be approached, as we must conclusively presume the Legislature approached it, i. e., with the mind fixed upon the public good to be attained by creating the office, and not upon the benefits which might accrue to an incumbent from his incumbency.

It is suggested that the section in question has been repealed, that it can, therefore, never be applicable to any one save relator, and for that reason is shown to be special. Every law is subject to repeal. That is a thing inherent in statutes. Upon the question whether it is general or special, a law is to be viewed as of the time it is formulated and passed. It is suggested by respondent that the act is justified because numerous acts of the kind have been passed. The Legislature has no power to amend a provision of the Constitution by the device of frequently violating it. Legislative and departmental construction may aid in resolving ambiguities, but cannot estop courts to apply the law when its meaning is established.

The real argument is that there are other inspection laws in which the chief inspecting officers are in like situation with the Warehouse Commissioner in so far as concerns the matter of removal from office, and that, therefore, they, with him, constitute a class which is indivisible for the purpose of providing methods of removal, and that since Section 5995 applies to the Warehouse Commissioner alone it is special and therefore void under Section 53 of Article IV. An answer to this requires an examination of the general features of the Grain Inspection Act with respect to the business it affects, the purposes it seeks to accomplish, the duties of the Commissioner, and the need, if any, for provisions

for removal of the Commissioner for the causes stated; and, in addition, a comparison of this act with others mentioned.

There are differences between the Grain Inspection Act and other inspection acts which may have something to do with this question. There is one which arises out of the character of public warehouses. Generally, inspection may be required when it is reasonably necessary to secure or protect the public health, safety, morals or welfare. [Coca Cola Bottling Works v. Mosby, 289 Mo. 462; Foster v. Masters and Wardens, 94 U. S. l. c. 248, and cases cited; 14 R. C. L. sec. 12, p. 694.] The business of public warehouses differs from those affected by other inspection acts in that it is clothed with a public interest and is subject to regulation, and in this State regulated (Sec. 6018, R. S. 1919) in the matter of charges which may be exacted for services rendered. [Munn v. Illinois, 94 U. S. 113.] There are also differences between the character of the evils intended to be prevented by grain inspection and those at which other inspection acts strike. Out of these arise marked differences between the duties of the Warehouse Commissioner and his aids and those of other inspectors, such as inspectors of oils, beverages, etc., There is also a difference in the places of inspection and the degree of watchfulness necessary to render the act effective. The Warehouse Commissioner must have (or acquire) for a proper discharge of his duties, expert knowledge of grades and grading of grain. He establishes grades. Upon these grades depend numerous important requirements of the act. He formulates rules for inspection and for fixing inspection charges. He must see that the grades are not mixed in storing and must keep fully informed as to the grain stored and the daily movements of grain. He is required to examine into the conditions and management of public warehouses, so far as these pertain to the public interest and to the security and convenience of persons doing business with such institutions; see that the persons in charge comply with the laws, and prosecute

violations thereof. For these purposes he is required personally to visit the public warehouses periodically and inquire into their management. The books of warehouse companies are made open to him and he is given power to examine warehouse officials respecting conditions and management; for this purpose he may subpoena witnesses, and administer oaths; and if his subpoena is disobeyed, the circuit court is required to compel such witness to appear and testify. His consent is required before published warehouse rates can be increased. There are other like duties.

It is quite obvious that inefficiency, neglect of duty or misconduct in office on the part of the Commissioner will have immediate and serious effects. It is also to be remembered that the Commissioner has exclusive supervision of the weighing of grain handled in public warehouses, and that his department has in charge the vital things which concern the marketing of the chief agricultural products of this State and section. It is obvious that inefficiency, neglect of duty or misconduct in office on the part of the Warehouse Commissioner would require some remedy. His inefficiency or neglect of duty or misconduct easily might destroy confidence in the grading and weighing of grains and in the security against dishonesty in public warehouses and quickly affect adversely our great markets for the products of so great concern to the public. The chief purpose of the act would thus be defeated. To fail to provide some means designed to protect against such result would have been a clear omission of duty. An examination of other inspection acts, of beverages, oils, etc., for instance, discloses that they differ materially from the Grain Inspection Act with respect to the exigency which would arise if the head of either of them should prove inefficient or neglectful or be guilty of misconduct in office. Those acts are chiefly concerned with the ascertainment of the physical contents and qualities and chemical structure of the products inspected, and prescribe with particularity the tests and methods to be applied. Much less is in-

trusted to the judgment of the chiefs of inspection and much less required of them personally. There is no such great concentration of material for inspection and no great probability of such immediate and serious injury to the public good, should they nod, as in the case of the Warehouse Commissioner who sits in control over the great markets of this section. These differences directly relate to the need for the lodgement of a power promptly to remove the Commissioner in case he becomes inefficient or neglectful or should be guilty of misconduct in office. In the face of these differences, though the rule that there is a presumption that the Legislature based its classification upon sufficient evidence (State v. Tower, 185 Mo. l. c. 95) be waived, it cannot be said that it appears beyond a reasonable doubt that there is no distinction in the situation in question which justifies separate legislation respecting the removal of the Warehouse Commissioner. Whether the legislation enacted is the wisest that could have been formulated is not the question. The conclusive thing is that the differences which appear have a reasonable relation to the matter of removal and afford a basis for legislation upon that subject. The legislative power is founded upon this. The wisdom of its exercise is another matter and not open to examination in this proceeding.

III. It is insisted the provision concerning removal in invalid because, it is argued, it "attempts to invest the executive department with judicial authority." The Constitution (Art. III) establishes three departments of government and makes them independent of each other. [Rhodes v. Bell, 230 Mo. l. c. 149, 153.] This **Judicial Power.** court and most others are committed to the doctrine that the Legislature may confer upon an executive officer or board the power to remove an official upon charges preferred, a notice given and after a hearing pursuant thereto, without thereby authorizing such officer or board to exercise judicial power in the sense in which the Constitution prohibits the exercise of such

power by any other than the officials of the judicial department. To the Missouri and other cases cited in the opinion of HIGBEE, J., might be added many others. The decision in Dullman v. Willson, 53 Mich. 392, relied upon by relator, is explained in respect to the instant question in Fuller v. Attorney General, 98 Mich. l. c. 105. "The better authority" is said in State ex rel. v. Council, 90 Wis. l. c. 619, to approve the rule heretofore adopted by this court. Such is the doctrine now "generally held." [State ex rel. Shaw v. Frazier, 39 N. D. 430.] Decisions are collected and New Jersey decisions reviewed in McCrau v. Gaul, 112 Atl. l. c. 342 et seq.; Ibid, 112 Atl. 606; Breeheen v. Riley, 200 Pac. 1042; Duffy v. Cooke, 239 Pa. St. l. c. 447, 448. The resemblance the required proceedings may bear to court procedure does not affect the question. An office is not property in the ordinary sense. The conditions upon which a statutory office may be retained can be prescribed by the Legislature. The act of removal is not made judicial because proceedings for removal are ordained which include some or all of the features of a trial. They are still mere conditions imposed upon the exercise of an executive or administrative power. But two states recognize property in an office in a sense resembling that contended for here. Even in those states the equilibrium of the doctrine is not very stable. Old cases so holding are based upon English decisions in which, usually, the right to office was a hereditament or, sometimes, in which it was held in freehold. The courts of this country, as a rule, do not admit the applicability of such decisions to questions concerning office under a government like ours.

IV. The only other point relator raises in his "Statement, Brief and Argument" is that "the so-called hearing before the Governor was so conducted by him as to constitute a denial to relator of the rights

Due Process.     secured to him by Section 30 of Article II of the Constitution of Missouri, and the attempted removal of relator from the office of Warehouse Commissioner was void for that reason."

194 Mo.—6

The section of the Constitution thus invoked provides that "no person shall be deprived of life, liberty or property without due process of law." It is not denied that the Governor formulated and served upon relator written charges and gave him due notice of the time and place of hearing, nor that relator appeared at the time and place and offered evidence and personally testified in the proceedings. No point was made before the Governor, so far as relator's "Statement, Brief and Argument" shows, concerning the legal sufficiency of the charges preferred, nor is any such matter pleaded in relator's return. Nor does he in his "Statement, Brief and Argument" make any such point in this court. He founds his argument on this branch of the case upon these: (1) that the Governor offered no evidence; (2) that he had prejudged the matter; (3) that after hearing evidence offered by relator from ten a. m. until two a. m. of the following day, the Governor broke off the hearing, though relator announced he could procure other witnesses whom he desired to bring before him; (4) that the relator was kept in ignorance of the evidence against him. Relator contends the record shows these things and that these show he was denied a hearing to which, as defined by him, he contends he was entitled.

The provisions of Section 5995, Revised Statutes 1919, respecting the Governor's power to remove the Commissioner, and his duties in that connection are as follows:

"The Governor may remove the Commissioner for inefficiency, neglect of duty or misconduct in office, giving him a copy of the charges against him and an opportunity of being publicly heard in person or by counsel, in his own defense, upon not less than ten days' notice. If such Commissioner shall be removed, the Governor shall file in the office of the Secretary of State a complete statement of all charges made against such Commissioner, and his findings thereon, together with a complete record of the proceedings."

The section further provides that:

"The Legislature also shall have the power, by a two-thirds vote of all members elected to each house, after ten days' notice in writing of the charges and a public hearing, to remove the Commissioner from office for dereliction of duty, or corruption, or incompetency."

Cases like State ex rel. v. Stone, 120 Mo. 428, and State ex rel. v. Shields, 272 Mo. 342, and the like are not applicable. The question whether the courts can compel a governor to perform a particular act, or whether they will entertain an action against him as an individual for damages for his failure to perform a duty enjoined upon him as Governor, are entirely different from that here which concerns the power of courts, in a contest between third persons, to inquire into the validity of an act of the Governor upon which rights of such third persons depend. Neither do they affect the question of the extent of court review of the Governor's proceedings in removing an officer when drawn in question in a case like this.

Since the pleadings fail to challenge the legal sufficiency of the charges made by the Governor, and since relator did not in his "Statement, Brief and Argument" assign this as a matter upon which he relied, the question is not presented in this case. The reason for relator's course in this respect is not material, but is apparent. This mention is elicited by a remark in a reply brief.

The formulation and due service of the charges and, besides, the appearance of relator at the appointed place and time gave jurisdiction to proceed. Due process did not require a trial in a judicial sense. The Legislature might have left the Governor free to remove at pleasure. Instead, it prescribed certain lawful conditions upon which the power to remove could be exercised. Due process in the matter of removal required no more than the statute required. Substantial compliance with the essence of the statute constitutes due process in a removal proceeding. The prejudice which is charged against the

Governor could not warrant the court in holding he was without jurisdiction to sit. That a governor is a human being was a fact known to the Legislature when this act was passed, and that, despite his high office, a governor is more or less subject to the infirmities of human nature could not have been unknown to it. That it was anticipated he might not proceed when there might be reason to do so is proved by the alternative provision for removal by the Legislature. In these circumstances, the act might have provided other procedure for removal in case it was shown the Governor was prejudiced and not to be trusted to deal fairly. No such provisions were enacted. No "change of venue" was allowed. The law-making power entrusted the matter of removal to the Governor without regard to any question concerning his state of mind or attitude toward an official coming within the act. Doubtless that body thought public sentiment a sufficient deterrent. Whatever it thought and whether its course was wise or otherwise, the act enables the Governor to proceed in any case within it. A particular state of mind which might be his in a particular case was not thought by the Legislature to be reason for refusing to invest him with the power to remove, and this court cannot amend the statute.

Since provision for removal was deemed necessary and since the power to remove must be lodged somewhere, the Legislature chose the Governor and reposed the power in him without any qualification or restriction in so far as concerns the feelings he might entertain toward any officer with respect to whom he might undertake to exert his power to remove. It follows that it is wholly needless to go into a discussion of the question whether the record shows the Governor had improperly formed an opinion adverse to relator in advance of the hearing he tendered him.

The failure of the Governor first to offer evidence is not of great consequence in the circumstances shown by this record. It is not necessary to decide whether the provision of the statute that relator might be "heard

in person or by counsel in his own defense'' means the same thing as the subsequent provision with respect to the legislative hearing which gives the Commissioner the right to ''a public hearing.'' Let it be assumed relator was entitled to a hearing in the sense that he was entitled to have evidence supporting the charges offered before he would be put upon his defense. As pointed out by HIGBEE, J., he did, in fact, proceed with evidence, the taking of which consumed sixteen hours, as the stipulation shows. So far as concerns the simple question whether the mere showing that no evidence was offered by the Governor invalidates the whole proceeding, it must be said that this objection would not be good even were this case here on appeal. The record, including the additional abstract, shows that the heads of inspection in several important places were called by relator and testified, but does not set out their testimony. The Chief Clerk was a witness. He testified he kept the books relating to ''the fund known as the Private Inspection and Weighing Fund,'' and that those books were upon the table before him as he testified. The Commissioner, himself, was on the stand for some hours. Sixteen hours were consumed in taking testimony, offered by relator, as the stipulation shows. The substance of the point made, so far as this question is concerned, is that there is no evidentiary basis for the order of removal. The stipulation shows there was a great deal of evidence taken. Since it was taken, the question, on this phase of the case, is not who offered it, but whether it supported the charges. The evidence is not before us. Since it is not before us, its sufficiency as a basis for the order cannot be reviewed. This is true though it be assumed we could, in this case, hold the order invalid on a record which contained all the evidence and showed it utterly to fail to sustain the charges. The question whether this could be done need not be decided. The failure of the Governor to prolong the hearing beyond the day for which it was set is not jurisdictional. It amounted, in the circumstances shown by the record, to what might be termed

a refusal to grant a continuance after the trial had be-
gun.   Further, as pointed out by HIGBEE, J., the testi-
mony may have shown admissions by relator which would
have rendered further testimony useless, and it is shown
that the books which, it would seem, would necessarily
prove or disprove many of the charges, were on the table,
and that the book-keeper who kept them was a witness
for relator.   What his testimony showed these books es-
tablished, if anything, is not in the record.   In the cir-
cumstances, no presumption can arise that they did not
make out proof of the charges.   Other charges depended
upon other books of the department.   With respect to
others the chiefs of departments who testified had full
knowledge.   With respect to the refusal to continue the
hearing longer, the case is quite unlike Ekern v. Mc-
Govern, 154 Wis. 157.   In that case less than an hour's
notice was given, and practically no opportunity to offer
evidence was afforded.   None was offered.   In an action
at law, if circumstances like those in the instant case
had arisen, it would not be more than error to refuse to
set a case over until another day after sixteen-hours'
hearing and with no more appearing than appears in this
record.   It would not subject the judgment to collateral
attack.   No stricter rule, at most, is to be applied in this
case.   An examination of the numerous cases cited in the
briefs and such others as are accessible discloses that
the objections made cannot be sustained on the record
here.

There is no duty resting upon this court to comment
upon the course pursued by the Governor save in so far
as what was done affects the validity of his removal of
the Commissioner.   That act is not shown to be invalid,
and that is the question presented.

For the reasons  stated I concur in the denial of the
writ of ouster.   *Higbee, David E. Blair* and *Elder, JJ.,*
concur.

WOODSON, J.   (dissenting).—I.   I am not going
into the merits or demerits of the facts of this case, but

State ex inf. Atty. Gen. v. Hedrick.

will assume, which I think we should, that the findings
of facts made by the Governor are correct and binding
upon this court. But I dissent from the majority opinion
upon two legal propositions. First, because in my opinion
**Special Law.** I think Section 5995 of the Statutes under
which the defendant was tried and convicted
is clearly violative of Section 53 of Article IV of the
Constitution which provides that no special law shall be
enacted or enforced where a general law will apply.
That section of the Constitution reads as follows:

"In all other cases where a general law can be made
applicable, no local or special law shall be enacted; and
whether a general law could have been made applicable
in any case is hereby declared a judicial question and as
such shall be judicially determined, without regard to
any legislative assertion on that subject."

I am unable to see why the Warehouse Commis-
sioner, Tax Commissioners, Game and Fish Commis-
sioner, Drug and Pure Food Commissioner, Commis-
sioner of Agriculture, Public Service Commissioners,
Police Commissioners, Oil Inspector and Bank Examin-
er, do not belong to the same general class. They are all
executive officers and are appointed to perform executive
duties, and not judicial or legislative in any sense. And
that being true why could not all of them be tried under
the same general law, just as executive officers of the
counties are tried under such a law, who perform the
same duties for the counties as the commissioners men-
tioned perform the same duties for the State?

Article 2 of Chapter 77, Revised Statutes 1919, ap-
plies to all such county commissioners, and as far as
material to this case reads as follows:

"Any person elected or appointed to any county,
city, town or township office in this State, except such
officers as may be subject to removal by impeachment,
who shall fail personally to devote his time to the per-
formance of the duties of such office, or who shall be
guilty of any willful or fraudulent violation or neglect
of any official duty, or who shall knowingly or willfully

fail or refuse to do or perform any official act or duty which by law it is his duty to do or perform with respect to the execution or enforcement of the criminal laws of the State, shall thereby forfeit his office, and may be removed therefrom in the manner hereinafter provided.''

And, of course, if they could be removed in the manner above stated for the violation of the criminal laws of the State, the Legislature could have included their removal for the violation of any civil law had it seen proper.

What is there in the Constitution to prevent the Legislature from enacting a general law of the character above mentioned, as expressed in Section 9175, just quoted, applicable to officials violating both civil and criminal laws? Nothing on earth, I submit, and to enact single and separate enactments or statutes for each and every separate officer, would be a direct violation of said Section 53 of Article IV of the Constitution before quoted, which expressly provides that the question as to whether it is a general or special law is a judicial question regardless of the expression of the Legislature.

II. My second reason for dissenting from the majority opinion is that said Section 5995, Revised Statutes 1919, does violence to Section 28 of Article IV of the Constitution for the reason that the title of the act of which said Section 5995 is a part, is fatally defective, in that it does not clearly express the subject of the act, nor does the title include within its scope and meaning any grant of power to the Governor to prefer charges, hold a hearing, make findings or remove the Warehouse Commissioner.

Title of Act.

Section 28 of Article IV of the Constitution in so far as here applicable reads as follows: ''No bill . . . shall contain more than one subject, which shall be clearly expressed in its title.''

I have quoted literally Section 5995, which was Section 4 of the Act of 1913 (Laws 1913, p. 356), in so far as is material to this case, in Paragraph I of this opinion, and the title to this particular act reads as follows: ''An

Act to repeal Article 2 of Chapter 60 of the Revised Statutes of Missouri, 1909, relating to inspection of grain and hay, and to enact in lieu thereof a new article, to be known as Article 2, relating to inspection and weighing of grain, abolishing the office of Railroad and Warehouse Commissioners, creating the office of Warehouse Commissioner and fixing his powers and duties, with an emergency clause.'' There is nothing contained in this title regarding the grant of power to the Governor to prefer charges against the Commissioner, nor to hold a hearing or try him for any misconduct in office, nor to make a finding of facts against him, or remove him from office for misconduct.

All the authorities hold that the title to the act must be a clear index or substantial statement of what the bill proper contains, but this title has no reference to the subject-matter whatever.

The following authorities sustain the foregoing conclusions: State v. Sloan, 258 Mo. 305, l. c. 313; State ex rel. v. Revelle, 257 Mo. 529; St. Louis v. Weitzel, 130 Mo. 600, l. c. 616; City of Kansas v. Payne, 71 Mo. 159, l. c. 162; State v. Great Western T. & C. Co., 171 Mo. 634, l. c. 643; State v. Burgdoerfer, 107 Mo. l. c. 30; 1 Story, Constitution, sec. 451; State ex rel. v. Gordon, 233 Mo. 383, l. c. 387; State v. Crites, 209 S. W. 863; Woodward Hardware Co. v. Fischer, 190 S. W. 576; Berry v. Majestic Milling Co., 223 S. W. 738; State v. Rawlings, 232 Mo. 544, l. c. 558; State ex rel. v. Wilder, 200 Mo. 97; Vice v. Kirksville, 217 S. W. 77 (cases there cited); Bell v. First Jud. Dist. Court of Nevada, 28 Nev. 290, l. c. 297-8; Brooks v. Hydorn, 76 Mich. 273, l. c. 278. I am therefore clearly of the opinion that the statute under which the Commissioner was charged, tried and convicted is unconstitutional, null and void, and of no force or effect, and that he was illegally removed from office without due process of law. *Walker, J.,* concurs in these views.

GRAVES, J. (dissenting).—I dissent from the opinion of my learned brother in this case, and concur in most

that is said by Woodson, J., in his dissenting opinion. I say most of what he says, because I do not want to appear as conceding that the findings of the Governor are correct on the merits, if this be material. For the views that I have in mind the correctness of that trial, either in its procedure or in its result, is wholly immaterial, and I therefore express no opinion one way or the other thereon, but may mention some of the charges preferred.

I have no disposition to make a *cause celebre* of this case, but do desire to briefly discuss the *legal propositions* therein, and *nothing further*. To do otherwise would add nothing to jurisprudence, reflect upon the intelligence of the magnificent bar of the State, and would be at the sacrifice of our own judicial self-respect.

I. The opinion mentions that in the course of the trial Bradshaw's attention was called to certain checks of his against the Private Inspection Fund. That the numbers of these checks were specified in the written charges preferred, and the book and pages were found where given. Some seven of the written Private charges were of this kind. Section 41 of the Inspection Fund. Act of 1913 provides that all fees for the inspection of grain in public warehouses and elevators shall be paid into the State Treasury monthly and become a part of the general revenue fund of the State. No provision that I find authorizes a private inspection fund, or any books to be kept in connection therewith. The act refers to public warehouses and elevators, and all the fees from this source go to the State Treasury. There is no charge that these legal fees were not deposited as required by law. This, only in answer to my brother's opinion, and is not intended for an opinion upon the trial of Bradshaw in anyway.

II. Relator first contends that Section 5995, Revised Statutes 1919 (the statute authorizing the removal of relator from office), is void for the reason ''that it is a special law, based upon an arbitrary classification, and

**Special Law.** is made applicable to a single individual only, whereas a general law could have been enacted" and it therefore violated Section 53 of Article IV of the Constitution, and more especially paragraph 32 of said section." More accurately speaking the law is made applicable to a single officer appointed by the Governor, and to a single office of a vast number of offices filled by the Governor.

Section 53 of Article IV of the Constitution, besides prohibiting the passage of local or special laws relative to divers subjects, in paragraph 32 further provides: "In all other cases where a general law can be made applicable, no local or *special* law shall be enacted; and whether a general law could have been made applicable in any case is hereby declared a judicial question, and as such shall be judicially determined, without regard to any legislative assertion on the subject." So that if Section 4 of the Act of 1913 is a general law it is not assailable here, but if it is a special law upon a subject which could be covered by a general law, then it is bad. To determine whether it is a special law, the subject of the law must be considered in the connection as used. The subject is removal from office, and as used in the statute it refers to the removal of a single officer, i. e. Grain and Warehouse Commissioner.

Removal from office is a subject of general character, and can always be covered by a general law made applicable to at least a large class of officers, if not to all officers except those where the removal is provided for by the Constitution rather than by statute. This law is special in that it refers to a single office, or officer. The class is Grain and Warehouse Commissioner, and not the divers occupants of that office from time to time. The removal is from a single office, and the class made by the Legislature is one of a single office or officer. To take a law out of special legislation the classification made must be a reasonable one, and one having a fair basis for the classification. Or if the law applies to a single object, then it must appear that the characteristics of

this particular object are such, that by reason of which, it could not be classed otherwise than by itself. In State ex rel. v. Gordon, 245 Mo. l. c. 33, this court quoted with approval the following:

"In order to determine whether or not a given law is general, the purpose of the act and the objects on which it is intended to operate must be considered. If these objects are distinguished from others by characteristics evincing a peculiar relation to the legislative purpose, and showing the legislation to be reasonably appropriate to the former and inappropriate to the latter, the objects will be considered, as respects such legislation, to be a class by themselves, and legislation affecting such a class, to be general."

The subject of this statute is the removal of a Grain and Warehouse Commissioner from office. What reason is there for singling out this one office or officer in a statute unto itself? Are there any peculiar characteristics which would distinguish this office or officer from a dozen or more appointive officers under the control of the Governor? In this connection it must not be overlooked that Section 4 of the Act of 1913 (now Section 5995, R. S. 1919) in addition to a removal for certain reasons by the Governor, also provides: "The Legislature also shall have the power, by a two-thirds vote of all members elected to each house, after ten days' notice in writing of the charges and a public hearing, to remove the Commissioner from office for dereliction of duty, or corruption, or incompetency."

What is the difference in this particular office which so distinguishes it from a dozen or more similar offices (under the appointive power of the Governor) as to justify the lawmakers in providing for this removal by the lawmakers themselves, by a kind of statutory impeachment? Why should not other similar officers be likewise treated? This provision of the statute is a rare one, and not to be often found, but if used at all, why not make it apply to all officers appointed by the Governor, by and with the consent of the Senate? A large

class of officers could be easily and legitimately arranged to which a general law of this character could be applied. We are not passing upon the validity of this portion of the law, except as the whole section is involved under Section 53, paragraph 32, of Article IV.

What we do insist is, that if the legislative removal is a proper and legitimate thing, there is no reason why it should be made applicable to this one office, and this one officer. There is absolutely nothing in this office to distinguish it from a dozen or more offices, similarly situated. A general law involving this feature could be made applicable to a large number of officers, and there is no earthly reason for singling out this particular office or this particular officer. Until there are pointed out the peculiar features which distinguish the office of Grain and Warehouse Commissioner from a dozen or more other offices, so far as the *subject of removal from office* is concerned (and this is the only subject for consideration) this Section 4 of Act of 1913 must be held to be a special law upon a subject which can readily be covered by a general law, and therefore void under the Constitution.

Upon the matter of removal from office we have now several general laws, applicable to different classes of offices. See Sections 9175, 9168, and 9174, Revised Statutes 1919. What the Legislature has done under these sections could well be done so as to cover by general law the office of Grain and Warehouse Commissioner, and divers other commissioners and officers, appointed by the Governor for the execution of given laws.

III. Section 4 of the Act of 1913 (Laws 1913, p. 354 et seq.) is void for the further reason, that such section is not included in the title of the act. The title to this act reads: ·

*Title of Act.*

"AN ACT to repeal Article 2 of Chapter 60 of the Revised Statutes of Missouri, 1909, relating to inspection of grain and hay, and to enact in lieu thereof a new article, to be known as Article 2, relating to inspection and

weighing of grain, abolishing the office of Railroad and Warehouse Commissioners, creating the office of Warehouse Commissioner and fixing his powers and duties, with an emergency clause.''

Section 28 of Article IV of the Constitution requires that the subject of a legislative act shall be single and *clearly* expressed in its title. At an early day (under the Constitution of 1875) this court, in City of Kansas v. Payne, 71 Mo. l. c. 162, said:

''The object of the constitutional provision was to require so clear an expression of the subject of the bill in the title, that it would at once apprise legislators and others interested of the precise subject of the proposed legislation.

'' 'The Constitution (says Judge Cooley) has made the title the conclusive index to the legislative intent. It is no answer to say that the title might have been more comprehensive if, in fact, the Legislature has not seen fit to so make it.' ''

In State v. Weitzel, 130 Mo. l. c. 616, it is said:

''The evident object of the provision of the organic law relative to the title of an act was to have the title *like a guide board,* indicate the general contents of the bill, and contain but one general subject which might be expressed in a few or a greater number of words. If those words only constitute one general subject; if they do not mislead as to what the bill contains; if they are not designed as a cover to vicious and incongruous legislation, then the title can stand on its own merits, is an honest title and does not impinge on constitutional prohibitions.''

And in State v. Coffee & Tea Co., 171 Mo. l. c. 643, it is crisply stated:

''The title to the bill should so express the subject of an act in such terms that the *members of the General Assembly and the people* may not be left in doubt as to what matter is treated of. [State v. Burgdoerfer, 107 Mo. 30.]''

This general rule, differently expressed, is found throughout our case law from the earliest cases up to the present. The purpose of the title to an act is not only to inform the legislators, but the people, and all who may be interested. It must be an index of what might be expected in the body of the bill. ''Like a sign board, it must indicate the general contents of the bill.'' It must not mislead, either by false words or. cunning omissions. It must not hide things, which if known, would incur the wrath of either the legislators or the interested public. Deception, in any form, should and does vitiate those things in the bill which have been hidden from view by the title.

What legislator, reading this title, would for a moment think that in the body of the bill was provided an impeachment proceeding? Even if it could be admitted (which we do not admit) that the removal of an officer by the Governor is a subject germane to the creating of the office, yet it can not be said when this executive function is placed-in the Legislature by a statutory impeachment trial, that such is germane. I dare say that there was not one legislator out of ten who participated in the passage of this act who ever dreamed that this radical provision was hid away in the body of the act. To my mind this alone voids Section 4 of the Act of 1913 under the provisions of Section 28 of Article IV of the Constitution of 1875.

The writ of ouster should go as prayed by relator. *Walker, J.,* concurs in these views.